## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JOSH GUTTMAN, Derivatively on Behalf of Nominal Defendant DOXIMITY, INC., | C.A. No. |
| Plaintiff, | |
| v. | **JURY TRIAL DEMANDED** |
| JEFFREY TANGNEY, ANNA BRYSON, KEVIN SPAIN, TIMOTHY CABRAL, PHOEBE YANG, REGINA BENJAMIN, and KIRA WAMPLER, | |
| Defendants, | |
| and | |
| DOXIMITY, INC., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

By and through his undersigned counsel, Plaintiff Josh Guttman ("Plaintiff") brings this shareholder derivative action on behalf of Nominal Defendant Doximity, Inc. ("Doximity" or the "Company") and against certain current and former officers and directors of the Company for: (i) violations of Sections 14(a), 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder; (ii) breaches of fiduciary duty; (iii) unjust enrichment; (iv) abuse of control and (v) waste of corporate assets. Plaintiff makes these allegations upon personal knowledge as to those allegations concerning herself and, as to all other matters, upon the investigation of counsel, which includes without limitation: (a) review and analysis of public filings made by Doximity and other related parties with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other

publications disseminated by certain of the Defendants (defined below) and other related non-parties; (c) review of news articles, shareholder communications, and postings on Doximity's website concerning the Company's public statements; (d) pleadings, papers, and any documents filed with, and publicly available from, the related consolidated securities fraud class action lawsuit captioned *In re Doximity, Inc. Securities Litigation*, Case No. 5:24-cv-02281-EKL (C.D. Cal.) (the "Related Securities Action"); and (e) review of other publicly-available information concerning Doximity and the Defendants.

## I.    NATURE OF THE ACTION

1.    Plaintiff brings this action derivatively for the benefit of Nominal Defendant Doximity against certain of the Company's current and former executive officers and directors aiming to rectify the Defendants' breaches of fiduciary duties for issuing false and misleading statements and/or omitting material information in the Company's public filings and proxy statements from approximately June 24, 2021, to August 8, 2023 (the "Relevant Period").[1]

2.    Doximity is a social media platform that has referred to itself as the "LinkedIn for doctors." Doximity targets its platform at all U.S. physicians. The platform provides its members with free access to its "Newsfeed" as well as "telehealth" tools. The Newsfeed is the primary function of the platform and consists of medical articles, videos, and paid advertisements. The telehealth tools include "scheduler" and "dialer" functions that assist doctors in performing remote visits with their patients. Doximity as a platform is free to join and use, thus the majority of their revenue is generated by advertisement spending from customers, including several of the largest

---

[1] The materially misleading statements and/or omissions were issued in the Company's financial reports and other public filings and releases from approximately June 24, 2021 to August 8, 2023; however, the wrongs complained of herein continue through to the present as the Company's internal controls remain deficient.

pharmaceutical companies in the world, including Merck, GlaxoSmithKline and Lilly. These customers that pay for hosted advertisements on the Newsfeed account for more than 90% of Doximity's revenue.

3.      Doximity relies on the reach of their platform, specifically the Newsfeed, to place advertisements in the view of enough members of their platform to both attract and retain advertising customers. Specifically, Doximity relies on members who ***actually use*** the platform (most importantly, the Newsfeed) rather than just open an account. Due to this distinction, the number of accounts that actively engage with and utilize the Newsfeed is central to the Company's profitability. Due to this, defendants repeatedly directed investors to Doximity's number of "***active members,***" which Doximity defined as members who logged into Doximity and clicked on internal links on a quarterly basis. Doximity itself has acknowledged that "[t]he size of our member base and our members' level of engagement are ***critical to our success***."

4.      Doximity focused their pitch to advertisers and investors on its ability to provide high user engagement. Defendants repeatedly represented that their user base included "***over 80% of all U.S. physicians as active members.***" Defendants also claimed to investors each quarter that its member engagement had "***increased***" across the platform and was reaching a new "***all-time high***." These representations were false and misleading as Doximity's base of active users was significantly lower that the "over 80% of all U.S. physicians" that the Company repeatedly claimed. In addition to the falsity of those claims, the member engagement was not increasing and instead actively declining. This decline in engagement included the Newsfeed, which was the only portion of the platform driving meaningful revenue for the Company.

5.      The Relevant Period begins on June 24, 2021, the day Doximity shares began publicly trading. Defendant Tangney, Doximity's CEO, went on CNBC's TechCheck to advertise

Doximity to investors. While describing Doximity, one of his claims included that "***today, we have over 80% of all U.S. physicians as active members of the platform.***" He repeated this claim later during the same CNBC interview. Doximity's stock price doubled that day with a market capitalization over $9 billion.

6.     Defendants repeated this claim for the entirety of the Relevant Period. Defendant Tangney continued to claim to investors that "over 80% of all U.S. physicians" were "active members" on Doximity. Based on this claim, investors understood the Company to be representing that over 80% of U.S. doctors were using the platform at least once a quarter. Defendant Tangney additionally claimed that the platform could reel them in as often as "if not every day then every week."

7.     Defendants additionally claimed to investors that the engagement on the platform was continuously increasing. Defendants repeated that engagement had increased "***across our entire platform***," with engagement reaching "***record highs***" each quarter. Defendants further specified that Newsfeed—the primary source of revenue for Doximity—was experiencing "***record***" engagement numbers. Defendants told investors that engagement on its Newsfeed continued to increase each quarter.

8.     Defendants also made efforts to deflect from doubters. Months after Doximity's IPO, a J.P. Morgan analyst report suggested that most Doximity users used the platform primarily for the telehealth tools and ***not*** the Newsfeed – the primary source of revenue generation. Defendant Tangney pushed back on these claims. During the Company's next earnings call on November 9, 2021, Tangney claimed that the data was "***just wrong***" and that engagement on the Newsfeed had "***never been higher***." Tangney claimed that Doximity had reviewed the relevant data "a bunch of different ways." Tangney and Doximity continued reporting each quarter that the

Company had achieved a "record number of quarterly active users" and had reached an "all-time high" in engagement "across our entire platform."

9.    Investors believed the repeated representations by Defendants. When awarding Doximity a "Buy" rating in July 2021, securities analysts claimed that their "premium valuation" for Doximity was based upon the fact that the Company was "an extremely unique asset with 80% of physicians as active members on the platform." After both Defendant Tangney's appearance on TechCheck and the November 9, 2021, earnings call, multiple analysts repeated Tangney's assertion claiming that his representations placed investor concerns about engagement on the platform "to rest."

10.    Defendant's repeated representations and rejections of investor concerns were not true. Indeed, multiple former employees whose roles granted them knowledge of the actual "active user" base on Doximity have claimed that there is "**no way**" that 80% of U.S. physicians were active members of Doximity. These former employees also claimed that engagement on Doximity's Newsfeed was significantly lower than investors were told. In order to confirm these accounts, counsel for lead plaintiff in the Related Securities Action conducted a survey of U.S doctors, which demonstrated the inaccuracy of Doximity's claim of 80% active membership. In fact, the survey found that Doximity overstated their number of active members by **more than 65%** and that **nearly half** of those physicians who did use the Doximity platform during the Relevant Period either **never** visited the Newsfeed or did so **less than once per quarter**.

11.    The Related Securities Action's survey was designed to ensure an accurate reflection of U.S. based physicians, with a sample size that provided a 95% confidence level—referred to by statisticians as the "gold standard" for surveys. The margin of error for responses was approximately 4%, which is at the low end of the "acceptable margin of error" in surveys, and

ensures the results accurately reflect the number of doctors who were active on the Doximity platform during the Relevant Period.

12.    Other studies corroborate the accounts of the former Doximity employees and the results of the survey from the Related Securities Action, further showing that the true active member count on Doximity was much lower than represented by Defendants during the Relevant Period. For example, an independent study published shortly after the Relevant Period conducted by the anesthesiology residency program at Westchester Medical Center found errors in the overwhelming majority of the programs' residents' and graduates' profiles on Doximity. Further, a former Doximity employee confirmed that more than half of the members' basic profile information was either left blank or incorrect. As analysts at Jehoshaphat Research explain in their report regarding Doximity published following the Relevant Period (the "Jehoshaphat Report"), these errors suggest that the representations of a user base including 80% of U.S. doctors as "active members" is incorrect, as profile owners had not corrected even basic errors on their profiles.

13.    Consistent with the Related Securities Action's survey, immediately following the Relevant Period, an analyst who focuses on healthcare stocks examined Defendant's claim that "over 80% of U.S. physicians" were "active members" on the Company's platform. The majority of doctors who responded to an inquiry from the analyst claimed that they either did not use Doximity at all, or only used the telehealth tools, but not the Newsfeed. Those doctors, in comparing their own experience to Doximity's claims, concluded that Doximity had been "massaging usage and engagement to drive valuation" for years. These findings and accounts are consistent with the conclusion in the Jehoshaphat Report: "Ask around (*as we have*), and we're confident that you'll find a great number of doctors who 'have' Doximity profiles *but don't engage with the platform in a meaningful way.*"

14.    Unbeknownst to investors, Defendants were aware that the actual level of engagement on the Doximity platform was far lower than that reported. For instance, multiple former employees have reported that a "Dashboard" program was used to keep track of the *actual* number of active members using Doximity, with one manager claiming that Defendant Tangney ordered the creation of the Dashboard program himself. Another employee who used the "Dashboard" several times per week to generate reports confirmed that the number of U.S. doctors who were active users quarterly always sat below 80% for each physician specialty throughout the entirety of the Relevant Period. Indeed, Defendant Tangney had full access to the Dashboard and acknowledged the true number of active members during regular Company offsites.

15.    The declining engagement numbers on the platform were often discussed in Doximity employees' internal emails, instant messaging, and Company meetings. Former Doximity employees who worked in different departments (including client development and business analytics), and regularly had access to the Dashboard, reported that there was declining engagement on the platform throughout the Relevant Period, including on the Newsfeed. These employees further claimed that the declining engagement was a frequent topic of discussion in meetings and internal reports during the Relevant Period.

16.    Inside the Company, Doximity was concerned with what would happen if its advertising customers found out about the low engagement with their ads. Several former Doximity employees claimed that there were concerns regarding customers taking their advertisement budgets elsewhere when they discovered the low engagement. In an effort to prevent this, a former Doximity Business Analytics Manager reported that employees were instructed to avoid providing unfavorable metrics to customers, including the engagement data on the Newsfeed, and rather steer customers toward more favorable metrics. This same Business

Analytics Manager claims they quit their job at Doximity to avoid participating in these distractive techniques as it was a source of discomfort among the entire business analytics team.

17.    These tactics, however, were unsustainable, and the Company's customers eventually began to question whether the engagement metrics being provided by Doximity were genuine. These customers would ultimately stop advertising on Doximity or reduce their purchases of advertisement upsells. "Upselling" was a term used to describe one-off purchases by existing customers of additional space for their advertisements during the year – a substantial source of Doximity's revenue.

18.    The truth about Defendants' misconduct was revealed on August 8, 2023, when the Company reported that it was cutting its revenue guidance for fiscal year 2024. Defendants stated on an investor earnings call that same day that the reduction was in relation to a decline in upsells, and further admitted that customers were spending their advertisement dollars on banner ads on other social media platforms due to concern that Doximity couldn't provide the user base that it claimed.

19.    Analysts quickly reacted to this news, downgrading the Company's stock and reducing their price targets for its shares. Analysts claimed this was due to the previously concealed lower user engagement metrics. For instance, analysts at Wells Fargo "question[ed] whether [Doximity's] clients are seeing a high enough [return on investment] to warrant putting more ad dollars in later in the year." Analysts at Morgan Stanley similarly found that a "stronger re-acceleration in the core newsfeed" was needed, as "slowing growth" in "user engagement" at Doximity adversely impacted upsells.

20.     Doximity and investors suffered the consequences of the revelation of these concealments. The market reacted decisively. Following these disclosures, the share price dropped by nearly *23%* in a single day, eliminating over *$900* million in shareholder value.

21.     In addition to the above, during the Relevant Period, the Individual Defendants caused the Company to repurchase its own stock at artificially inflated prices resulting from the above misrepresentations. Between June 2022 and July 2023, nearly 3,398,998 shares of the Company's common stock was repurchased, costing the Company over $109.1 million. Moreover, certain Individual Defendants engaged in illicit insider sales of Company stock while Doximity's stock price was artificially inflated, for proceeds of approximately $4.4 million.

22.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and the Company have suffered significant losses and damages.

## II.    JURISDICTION AND VENUE

23.     This Court has jurisdiction over this action pursuant to the subject matter of this action pursuant to 28 U.S.C. § 1331 because the claims arise under and pursuant to Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), and Section 10(b) of the Exchange Act and Rule 10(b)-5 promulgated thereunder.

24.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a), as they relate to Plaintiff's claims under 15 U.S.C. § 78n(a).

25.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), because a substantial portion of the transactions and wrongs complained of herein occurred in this District and defendants have received substantial compensation within this District by doing business here and engaging in numerous activities that had an effect in this jurisdiction.

### III.    PARTIES

####    A.    Plaintiff

26.    Plaintiff has been a shareholder during the Relevant Period, is currently, and has continuously been, a holder of Doximity common stock.

####    B.    Nominal Defendant

27.    Nominal Defendant Doximity is incorporated in Delaware and its current principal executive offices are located at 500 3rd Street, Suite 510, San Francisco, CA 94107. The Company's common stock trades on the NYSE under the symbol "DOCS."

####    C.    Defendants

28.    Defendant Jeff Tangney ("Tangney") is a co-founder of the Company and has been its Chief Executive Officer ("CEO") and a member of the Company's Board of Directors (the "Board") since Doximity's inception in April 2010. For the fiscal years of 2021, 2022, 2023, and 2024, Defendant Tangney received $21,312,948, $243,388, $243,726, and $298,869 in total compensation,[2] respectively. Defendant Tangney is named as a defendant in the Related Securities Action.

29.    Defendant Anna Bryson ("Bryson") is the Company's Chief Financial Officer ("CFO") since February 2021. Prior to her role as the Company's CFO, Defendant Bryson served in various other positions within the Company, including Vice President of Strategic Finance, Financial Planning, and Analysis. For the fiscal years of 2021, 2022, 2023, and 2024 Defendant Bryson received $4,356,867, $403,211, $453,709 and $3,866,207 in total compensation, respectively.

---

[2] Includes salary, stock awards, option awards, non-equity incentive plan compensation and all other compensation.

30.     Defendant Kevin Spain ("Spain") has served as a Member of the Board since 2011. For the fiscal years of 2022, 2023, and 2024, Defendant Spain received $39,000, $247,254, and $241,937 in total compensation, respectively. Defendant Spain is a member of the Board's Audit Committee and the Chair of the Compensation Committee.

31.     Defendant Phoebe Yang ("Yang") has served as a Member of the Board since 2022. For the fiscal years of 2023 and 2024 Defendant Yang received $399,874 and $229,937 in total compensation. Defendant Yang is a member of the Board's Compensation Committee and a member of the Nominating and Governance Committee.

32.     Defendant Regina Benjamin ("Benjamin") has served as a Member of the Board since 2020. For the fiscal years of 2022, 2023, and 2024, Defendant Benjamin received $33,000, $239,254, and $233,937 in total compensation, respectively. Defendant Benjamin is a member of the Board's Audit Committee and a member of the Nominating and Governance Committee.

33.     Defendant Kira Wampler ("Wampler") has served as a Member of the Board since 2020. For the fiscal years of 2022, 2023, and 2024, Defendant Wampler received $33,000, $239,254, and 233,937 in total compensation, respectively. Defendant Wampler is a member of the Board's Compensation Committee and the Chair of the Nominating and Governance Committee.

34.     Defendant Tim Cabral ("Cabral") has served as a Member of the Board since 2020. For the fiscal years of 2022, 2023, and 2024, Defendant Cabral received $37,500, $245,254, and $239,937 in total compensation, respectively. Defendant Cabral is the Chair of the Board's Audit Committee.

35.     Defendants Tangney, Spain, Yang, Benjamin, Wampler, and Cabral are collectively referred to herein as the "Director Defendants."

36.     The Director Defendants, along with Defendant Bryson, are collectively referred to herein as the "Individual Defendants."

37.     The Individual Defendants, along with Doximity, are collectively referred to herein as the "Defendants."

## IV.    FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

38.     By reason of their positions as officers, directors, and/or fiduciaries of Doximity, and because of their ability to control the business and corporate affairs of Doximity, the Individual Defendants owed, and owe, the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were, and are, required to use their utmost ability to control and manage Doximity in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of Doximity and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

39.     Each director and officer of the Company owes to Doximity and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing.

40.     In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's financial and business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

## Duties of the Members of the Audit Committee

41.    Pursuant to the Audit Committee Charter of Doximity[3], the purpose of the Audit Committee is to "assist the Board of Directors (the "Board") in its oversight of (1) the integrity of the Company's financial statements, (2) the Company's compliance with legal and regulatory requirements, (3) the qualifications, independence and performance of the Company's independent auditors, and (4) the performance of the Company's internal audit function," as well as to "prepare the report required by the rules of the Securities and Exchange Commission (the "SEC") to be included in the Company's annual proxy statement."

42.    Concerning the Company's financial statements and annual audit, the Audit Committee Charter sets forth the following responsibilities:

- The Audit Committee shall review the overall audit plan (both internal and external) with the independent auditors and the members of management who are responsible for preparing the Company's financial statements, including the Company's Chief Financial Officer and/or principal accounting officer or principal financial officer (the Chief Financial Officer and such other officer or officers are referred to herein collectively as the "Senior Accounting Executive").

- The Audit Committee shall meet to review, and shall discuss with management (including the Company's Senior Accounting Executive) and with the independent auditors, the Company's annual audited financial statements, including (a) all critical accounting policies and practices used or to be used by the Company, (b) the Company's disclosures under "Management's Discussion and Analysis of Financial Conditions and Results of Operations" prior to the filing of the Company's Annual Report on Form 10-K, and (c) any significant financial reporting issues that have arisen in connection with the preparation of such audited financial statements.

- The Audit Committee must review:

  (i) any analyses prepared by management and/or the independent auditors setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements. The Audit Committee may consider the ramifications of the use of such alternative disclosures and treatments

---

[3] Available at https://s201.q4cdn.com/617428576/files/doc_downloads/Governance/2023/05/Audit-Committee-Charter-Revised-5-5-2023.pdf.

on the financial statements, and the treatment preferred by the independent auditors. The Audit Committee may also consider other material written communications between the independent auditors and management, such as any management letter or schedule of unadjusted differences;

(ii) major issues as to the adequacy of the Company's internal control s and any special audit steps adopted in light of material control deficiencies;

(iii) major issues regarding accounting principles and procedures and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles; and

(iv) the effects of regulatory and accounting initiatives, as well as off-balance sheet transactions and structures, on the financial statements of the Company.

43. Concerning the Company's quarterly financial statements, the Audit Committee

Charter sets forth the following responsibilities:

The Audit Committee shall meet to review, and shall discuss with management and the independent auditors, in each case prior to the filing of the Company's Quarterly Reports on Form 10-Q, (1) the Company's quarterly financial statements and the Company's related disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," (2) such issues as may be brought to the Audit Committee's attention by the independent auditors pursuant to Statement on Auditing Standards No. 100, and (3) any significant financial reporting issues that have arisen in connection with the preparation of such financial statements.

44. Concerning legal and regulatory compliance, the Audit Committee Charter sets

forth the following responsibilities:

- The Audit Committee shall discuss with management legal matters (including pending or threatened litigation) that may have a material effect on the Company's financial statements or its compliance policies and procedures.

- The Audit Committee shall review and approve all related party transactions of the Company in accordance with the policies of the Company in effect from time to time.

45. Upon information and belief, the Company maintained versions of the Audit

Committee Charter during the Relevant Period that imposed the same, or substantially and

materially the same or similar, duties on, among others, the Individual Defendants, as those set forth above.

### Duties Pursuant to the Company's Code of Business Conduct and Ethics

38.     The Individual Defendants, as officers and/or directors of Doximity, were also bound by the Company's Code of Business Conduct and Ethics (the "Code")[4] which, according to the Code, is designed "to aid the Company's directors, officers and employees in making ethical and legal decisions wen conducting the Company's business and performing their day-to-day duties." All directors, officers and employees are expected review the Code on a periodic basis.

39.     Regarding compliance with laws, rules, and regulations, the Code states:

The Company requires that all employees, officers and directors comply with all laws, rules and regulations applicable to the Company wherever it does business. Not in limitation of the foregoing, the Company is committed to complying with all laws pertaining to freedom of association, collective bargaining, immigration, wages, hours, and benefits as well as laws prohibiting forced, compulsory and child labor. You are expected to use good judgment and common sense in seeking to comply with all applicable laws, rules and regulations and to ask for advice when you are uncertain about them.

A number of training resources for this Code are available, including in-person training at all new hire orientation sessions and explanatory summaries posted on the Company's internal websites. In addition, you may contact the Chief Compliance officer regarding any additional inquiries at any time. If you become aware of the violation of any law, rule or regulation by the Company, whether by its officers, employees, directors, or any third party doing business on behalf of the Company, it is your responsibility to promptly report the matter to your supervisor or to the General Counsel. While it is the Company's desire to address matters internally, nothing in this Code should discourage you from reporting any illegal activity, including any violation of the securities laws, antitrust laws, environmental laws or any other federal, state or foreign law, rule or regulation, to the appropriate regulatory authority. Employees, officers and directors shall not discharge, demote, suspend, threaten, harass or in any other manner discriminate or retaliate against an employee because he or she reports any such violation, unless it is determined that the report was made with knowledge that it was false. This Code should not be

---

[4] Available at https://s201.q4cdn.com/617428576/files/doc_downloads/Governance/2023/Code-of-Conduct-and-Ethics.pdf.

construed to prohibit you from testifying, participating or otherwise assisting in any state or federal administrative, judicial or legislative proceeding or investigation.

40.    Concerning insider trading, the Code states:

Employees, officers and directors who have material non-public information about the Company or other companies, including our suppliers and customers, as a result of their relationship with the Company are prohibited by law and Company policy from trading in securities of the Company or such other companies, as well as from communicating such information to others who might trade on the basis of that information. To help ensure that you do not engage in prohibited insider trading and avoid even the appearance of an improper transaction, the Company has adopted an Insider Trading Policy, which is distributed to employees and is also available from the Legal Department and posted in our internal Wiki for employees.

If you are uncertain about the constraints on your purchase or sale of any Company securities or the securities of any other company that you are familiar with by virtue of your relationship with the Company, you should consult with the General Counsel before making any such purchase or sale.

41.    Concerning ethical/honest conduct and fair dealing in regard to customers and

others, the Code states:

Employees, officers and directors should endeavor to deal honestly, ethically and fairly with the Company's suppliers, customers, competitors and employees. Statements regarding the Company's products and services must not be untrue, misleading, deceptive or fraudulent. You must not take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair-dealing practice. The Company is committed to being a responsible corporate citizen and expects the same of its customers and business partners. The Company will not knowingly conduct business with any individual or company that participates in the exploitation of children, human trafficking, or forced, compulsory or child labor, or other such human rights violations. In the event any employee, officer or director of the Company becomes aware (or has any reason to believe) that any organization with whom the Company has a business relationship engages in any such violations, this must be reported immediately to the Chief Compliance Officer.

42.    Concerning accuracy of records, the Code states:

Employees, officers and directors must honestly and accurately report all business transactions. You are responsible for the accuracy of your records and reports. Accurate information is essential to the Company's ability to meet legal and regulatory obligations. All Company books, records and accounts shall be maintained in accordance with all applicable regulations and standards and accurately reflect the true nature of the transactions they record. The financial

statements of the Company shall conform to generally accepted accounting rules and the Company's accounting policies. No undisclosed or unrecorded account or fund shall be established for any purpose. No false or misleading entries shall be made in the Company's books or records for any reason, and no disbursement of corporate funds or other corporate property shall be made without adequate supporting documentation.

43.    Concerning public disclosures made by the Company, the Code states:

It is the policy of the Company to provide full, fair, accurate, timely and understandable disclosure in reports and documents filed with, or submitted to, the Securities and Exchange Commission and in other public communications.

44.    Upon information and belief, the Company maintained versions of the Code during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on, among others, the Individual Defendants, as those set forth above.

**Control, Access, and Authority**

45.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Doximity, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Doximity.

46.    Because of their advisory, executive, managerial, and directorial positions with Doximity, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Doximity.

47.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Doximity and was at all times acting within the course and scope of such agency.

**Reasonable and Prudent Supervision**

48.    To discharge their duties, the officers and directors of Doximity were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls

of the financial affairs of the Company. By virtue of such duties, the officers and directors of Doximity were required to, among other things:

(a) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) properly and accurately guide shareholders and analysts as to the true financial and business prospects of the Company at any given time, including making accurate statements about the Company's business and financial prospects and internal controls;

(d) remain informed as to how Doximity conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(e) ensure that Doximity was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## V.    BREACHES OF DUTIES

49.    Each Individual Defendant, by virtue of their position as a director and/or officer, owed to Doximity and its shareholders the fiduciary duties of loyalty and good faith, and the exercise of due care and diligence in the management and administration of the affairs of Doximity, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations

as directors and officers of Doximity, the absence of good faith on their part, and a reckless disregard for their duties to Doximity and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to Doximity.

50.    The Individual Defendants each breached their duties of loyalty and good faith by allowing the Individual Defendants to cause, or by themselves causing, the Company to make false and/or misleading statements that misled shareholders into believing that disclosures related to the Company's financial and business prospects were truthful and accurate when made.

51.    In addition, as a result of the Individual Defendants' illegal actions and course of conduct, the Company is now the subject of the Related Securities Action that alleges violations of the federal securities laws. As a result, Doximity has expended, and will continue to expend, significant sums of money to rectify the Individual Defendants' wrongdoing.

## VI.    CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

52.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with, and conspired with, one another in furtherance of their wrongdoing. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

53.    During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to mislead shareholders into believing that the Company's business and financial prospects were better than they actually were. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

54.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the

Individual Defendants' violations of law, including breaches of fiduciary duties, unjust enrichment, gross mismanagement, and abuse of control; and (b) disguise and misrepresent the Company's actual business and financial prospects.

55.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

56.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of their overall contribution to and furtherance of the wrongdoing.

## VII.    SUBSTANTIVE ALLEGATIONS

### A.    Background of the Company

57.    Doximity is a specialized online platform exclusively for U.S medical professionals. The Company has described its platform as the "LinkedIn for doctors."[5] In addition to member profiles, which Doximity describes as digital résumés, the Company's platform consists of: (i) a Newsfeed, which contains medical news, sponsored content, and paid advertisements; and

---

[5] *See, e.g.*, Saadeqa Khan, *Talking Data In Healthcare And Opportunities For Women With Dr. Bushra Anjum*, Scientiamag.com (Jul. 24, 2021).

(ii) doctor telehealth tools, which include a "scheduler" and "dialer" for doctors to conduct virtual visits with patients.

58.    Membership and access to the Doximity platform and telehealth tools are free for medical professionals. Instead of charging members, Doximity earns money through selling digital advertising space on the Newsfeed section of its platform. As analysts evaluating the Company have explained, "Doximity generates revenue by allowing pharmaceutical manufacturers and health systems to advertise on the platform"—*i.e.*, by "monetizing the finite resource of clinician eyeballs."[6]

59.    Doximity's customers are pharmaceutical manufacturers, including major drug companies such as Merck, GlaxoSmithKline, and Lilly. At the start of each year during the Relevant Period, these drug companies entered into year-long subscriptions with Doximity to purchase "ad space" on the Doximity platform (also referred to as "marketing solutions"). As Doximity explained in its SEC filings, "[p]harmaceutical manufacturers are able to use Doximity to run highly targeted marketing campaigns in a digital format, maximizing access to important physician audiences and reducing reliance on in-person sales representatives."[7] Doximity's marketing solutions promised these companies a higher return on investment than in-person visits from sales representatives and other traditional advertising methods. In addition to these year-long subscriptions, Doximity offered pharmaceutical manufacturers "upsells" during the course of the year, which were offers for one-time purchases of additional advertising space.

60.    During the Relevant Period, Doximity's customers' ads were shown almost exclusively on the Newsfeed section of the Company's platform. As Doximity's Chief Strategy

---

[6] March 7, 2022 SVB Leerink Analyst Report at 3; April 4, 2022 Bank of America Securities Analyst Report at 3.
[7] Doximity Form S-1 Registration Statement at 5 (May 28, 2021) (the "Registration Statement").

Officer, Nate Gross, explained during the Relevant Period, "we've only really monetized this one area of the platform from an eyeball perspective."[8] The sale of digital advertisement space on Doximity's Newsfeed was its "bread and butter" during the Relevant Period, with more than 93% of its revenue coming from the sale of advertising space on its Newsfeed.[9]

61.    Not surprisingly, analysts were thus laser focused on Doximity's Newsfeed during the Relevant Period, as it drove nearly all of the Company's revenues. Analysts saw the Newsfeed as "the foundation of [Doximity]" and "the primary use-case for physicians."[10] Analysts understood, and wrote research reports explaining, that Doximity's Newsfeed allowed the Company to command "greater wallet share with commercial partners," that Doximity "monetize[s] primarily through pharma and health system marketing campaigns" on the Newsfeed, and that ">90% of [Doximity's] revenue was driven by newsfeed marketing," which was also Doximity's "main driver of growth."[11] And when discussing Doximity's growth prospects, analysts pointed to the Company's potential to "build[] brand equity via Newsfeed."[12]

### B.    Importance of User Engagement to Doximity

62.    Because Doximity generated nearly all of its revenues through digital advertising on the Newsfeed, user engagement on the Newsfeed was paramount to the Company's success. Doximity could only attract and retain advertising customers, who were the driving force of its revenue, if its advertisements were viewed by a large number of doctors. As analysts explained,

---

[8] November 22, 2021 Piper Sandler Global Healthcare Conference at 5.
[9] *See, e.g.*, Doximity FY 2023 Form 10-K at 51; June 16, 2022 Goldman Sachs Global Healthcare Conference at 2.
[10] July 19, 2021 William Blair Analyst Report at 9, 18.
[11] July 19, 2021 William Blair Analyst Report at 5, 14; July 19, 2021 Morgan Stanley Analyst Report at 7; October 31, 2022 Wells Fargo Analyst Report at 2; June 8, 2023 Piper Sandler Analyst Report at 4.
[12] *Id.*

Doximity's success depended on "the delivery of advertising content or 'impressions' to targeted members," and "[i]f active usage of the Doximity platform is not very high for many users, then it could limit how much Doximity's customers will be willing to spend on advertising on the platform."[13]

63.     Doximity competes with various social media platforms, as well as health-related websites and mobile apps, for its customers' advertising dollars. Its competitors include major technology companies with online networking and collaboration tools, such as LinkedIn and Facebook, as well as niche platforms designed for medical professionals, like Sermo and Medscape. To compete with these social media platforms, Doximity must show its pharmaceutical platforms. As industry analysts have noted, "[t]here are few things that tell you more about the overall health of your app than a good, hard look at user engagement."[14]

64.     Doximity itself has acknowledged the importance of member engagement to the Company's bottom line. In each SEC quarterly and annual filing during the Relevant Period, Doximity expressly recognized that "[t]he size of our member base and our members' level of engagement are ***critical to our success***."[15] Doximity additionally acknowledged that a decrease in member engagement would render the Company "less attractive to our pharmaceutical manufacturer and health system customers" and that, if Doximity were unable to "maintain and increase [its] member base and member engagement, [its] revenue, operating results, financial condition, business, and future growth potential may be adversely affected."[16]

---

[13] May 18, 2022 Piper Sandler Company Note at 1; September 12, 2022 Alumbra Analyst Report at 1.
[14] *The ultimate guide to user engagement*, Appcues.com.
[15] *See e.g.*, May 27, 2022, Form 10-K at 16.
[16] *See e.g.*, May 26, 2023, Form 10-K at 16.

65.     Analysts likewise recognized the importance of user engagement to Doximity. In their research reports, analysts emphasized that "[e]ngagement is key on the Doximity platform due to the majority of revenues coming from its Marketing Solutions segment which would likely drive less spending if physician engagement declines."[17] They further added that "the size of DOCS' network and the level of engagement from members within the network is a key indicator of the success of the company."[18] Analysts also explained that "higher engagement" would "ultimately driv[e] higher return on ad spend for [Doximity's] high margin marketing solutions," that Doximity's engagement level made the Company "more attractive to pharmaceutical manufacturers, hospitals, and health systems," and that high engagement levels at Doximity would lead "to advertising space becoming incredibly valuable, especially [for customers to] advertise their products to doctors."[19] Analysts particularly recognized the importance of whether Doximity's members were "spend[ing] time viewing the Newsfeed—and thus ads."[20]

66.     In evaluating user engagement, social media companies are especially focused on the number of "active members" on the platform. A larger number of active members—as opposed to one-off visitors—makes a social media platform more valuable for advertising customers and, thus, investors. For this reason, social media companies—including LinkedIn, Twitter, and Instagram—regularly report the number of active members on their platforms.

---

[17] July 19, 2021 Needham Analyst Report at 4.
[18] October 13, 2022 BTIG Analyst Report at 36.
[19] July 19, 2021 Needham Analyst Report at 6; March 7, 2022 Needham Analyst Report at 3; January 7, 2022 CrispIdea Analyst Report at 1; October 13, 2022 BTIG Analyst Report at 3.
[20] October 14, 2021 J.P. Morgan Analyst Report at 1.

C.    **Doximity Assured Investors Throughout the Relevant Period That Over 80% of U.S. Physicians Were Active Members of Doximity's Platform**

67.    Throughout the Relevant Period, Defendants represented to investors that "over 80%" of U.S. physicians were "active members" of the Doximity platform. Consistent with industry standards, Doximity defined "active members" on its website throughout the Relevant Period as follows: "[a]lso known as active users, members of a social media network that log in and click on internal links on a regular basis," either "weekly," "monthly" or, at minimum, "quarterly."[21] Likewise, internally at Doximity, "active members" and "active users" referred to the number of members who used the platform on, at minimum, a quarterly basis.[22]

68.    Defendants' representation that more than 80% of U.S. physicians were "active members" of the Doximity platform was the centerpiece of Defendants' public pitch throughout the Relevant Period, and a primary reason why analysts recommended that investors purchase Doximity's stock.

69.    The Relevant Period begins on June 24, 2021, when Doximity sold over $600 million of stock to investors as part of its initial public offering ("IPO"). On that day, Defendant Tangney appeared on CNBC's TechCheck, a television program for investors in technology companies. When asked by the CNBC interviewer to "tell our viewers what you guys are that makes you the LinkedIn for doctors," Defendant Tangney responded that "today we have over

---

[21]    *See*    https://tf-support.doximity.com/hc/en-us/articles/360039773833-44-Social-Recruiting-Terms-Every-Physician-Recruiter-Should-Know. Likewise, Doximity defined "active providers" to mean providers that used the platform on, at minimum, a quarterly basis. *See e.g.*, May 16, 2023 Presentation (identifying "380K Telehealth Unique Active Providers" on the Doximity Platform) and May 26, 2023 Form 10-K ("we had over 380,000 unique active providers use our telehealth tools in the quarter ended March 31, 2023").

[22] According to former employees that provided information to plaintiffs in the Related Securities Action, when active member and engagement metrics were discussed internally at Doximity, the Company always provided the percentage and number of quarterly active users.

*80% of all U.S. physicians as active members on the platform*." Minutes later, when asked by the CNBC interviewer about Doximity's core strengths, Defendant Tangney emphasized "*again we're over 80% of all U.S. physicians as active members*."

70.    Doximity's share price skyrocketed following Doximity's public offering and Defendant Tangney's interview on CNBC's TechCheck. Its price more than *doubled* in a single day, closing at $53 per share and giving the Company a market capitalization of over $9.3 billion. Media outlets published articles and news alerts specifically singling out Defendant Tangney's representation that "*80% of all U.S. physicians [are] active members on the platform.*"[23]

71.    Doximity and Defendant Tangney ensured this representation was the first item inquiring investors learned about Doximity. To that end, on its "Investor Relations" page of its website throughout the Relevant Period, Doximity featured a "business overview" video. Defendant Tangney appeared at the start of the video, again representing that "*[t]oday, over 80% of all U.S. physicians use our platform*."[24]

72.    At quarterly investor conferences and during media interviews throughout the rest of the Relevant Period, Defendant Tangney repeatedly represented that over 80% of U.S. doctors were active members on the Doximity platform. For example:

- On August 10, 2021, following the Company's announcement of its first earnings report, Defendant Tangney stated, in explaining what was "driving" the results, that "*we have over 80% of all U.S. physicians as active members on our platform*."

- On November 10, 2021, following the Company's announcement of its second earnings report, Defendant Tangney emphasized to investors during an interview with CNBC that "*[o]ver 80% of U.S. physicians are active members of our platform.*"

---

[23] CNBC TechCheck Interview With Doximity CEO Jeffrey Tangney; Doximity's stock doubles after IPO. Here's how it plans to keep the momentum going, MedcityNews.com.
[24] *See* https://investors.doximity.com/overview/default.aspx.

- On February 9, 2022, reporting the next earnings call, Defendant Tangney gave another interview with CNBC where he claimed that "*over 80% of all U.S. physicians use us* to *power millions of digital interactions each day*."

- (4) On March 10, 2022, during a Morgan Stanley Investor Conference, Defendant Tangney stressed to investors that "*we have over 80% of all U.S. physicians as active members, and they're doing millions of interactions with us each day*."

73.    Analysts credited Defendants' repeated representations that Doximity had "over 80% of U.S. physicians today as active members," identifying the 80% active user metric as an important asset of the Company and a key reason to buy its stock. For example, in recommending that investors "BUY" Doximity's stock, analysts at Canaccord Genuity justified its "premium valuation" for Doximity by virtue of the fact that the Company was "*an extremely unique asset with 80% of physicians as active members on the platform*," noting that "[p]hysicians are the key decision makers regarding what medical procedures and drug therapies are to be utilized to treat patients [and that] having effective access to these decision makers is highly valuable."[25] In emphasizing that investors should buy Doximity stock, analysts at J.P. Morgan also highlighted that "*over 80% of U.S. physicians [are] using the platform*, which we see as a significant moat against new entrants."[26] Likewise, in explaining why Doximity was "[u]nique," analysts at William Blair reported that "[t]he network is the key," repeating Defendants' representation that over 80% of physicians were part of the platform and "*used daily by nearly all of them.*"[27]

74.    Defendants forcefully denied any suggestion that Doximity had fewer active members than the Company represented. For example, on October 14, 2021, J.P. Morgan published an analyst report questioning Doximity's engagement and noting that, based on third-party data, it appeared that "[o]f the 1.8M total members on the platform," only "*~4.9%*, have a

---

[25] July 19, 2021 Canaccord Genuity Analyst Report at 20.
[26] July 19, 2021 J.P. Morgan Analyst Report at 13.
[27] July 19, 2021 William Blair Supplemental Information Deck at 6.

session daily with **13.9%** on a monthly basis for the month of September."[28] In direct response to this report, during the next investors earnings call, Defendant Tangney dispelled any concerns about the number of active members on Doximity's platform. Specifically, on the November 9, 2021 earnings call, Defendant Tangney assured investors that he and Doximity were thoroughly informed about the Company's active user metrics. On this subject, Defendant Tangney represented that "our users and usage is … mid-double-digit percentages **up** from our pre-pandemic levels and any third-party data that suggests otherwise is **just wrong**," adding "**believe me, we've looked at this a bunch of different ways**." By emphasizing to investors that Doximity, and he personally, rigorously reviewed the data, Defendant Tangney reinforced the purported reliability of his representation that over 80% of all U.S. doctors were active members.

75.    Later during the same November 9, 2021 earnings call, the J.P. Morgan analyst who compiled "some of the spooky engagement reports" further questioned Defendants about Doximity's number of active members, pointing to third-party website tracking reports. In response, Defendant Tangney again dismissed any concerns about his prior representations on the subject. In elaborating why J.P. Morgan's concerns were "just wrong," Defendant Tangney retorted that "a lot of these third-party trackers" that suggested low engagement on the Doximity platform "are based on free VPN software," which supposedly produced unreliable results. Defendant Tangney implored analysts and investors to trust him and the Company's representations about its members, stating, "there's unfortunately not a good sort of, a Nielsen sort of this space."

76.    Following the November 9, 2021 investor conference, Defendant Tangney continued his effort to squash any investor concerns about Doximity's representations about its

---

[28] October 14, 2021 J.P. Morgan Analyst Report at 3.

"active members." To that end, on November 10, 2021, the day after the investor conference, Defendant Tangney appeared on CNBC's TechCheck. During the interview, he again specifically and unequivocally represented to investors that "*[o]ver 80% of U.S. physicians are active members of our platform.*" That same day, CNBC's TechCheck published online its interview of Defendant Tangney, headlining his representation.

77.    Analysts accepted Defendants' assurances and continued denials, including the J.P. Morgan analyst who originally questioned Doximity's representations about its active members. Following the November 9, 2021 earnings call and Defendant Tangney's subsequent appearance on TechCheck, analysts (including at J.P. Morgan) specifically highlighted and repeated Defendant Tangney's representation that "[o]ver 80% of physicians are active members" of Doximity, which supposedly made Doximity a "buying opportunity."[29] In its report, the J.P. Morgan analyst who authored the "spooky engagement reports" explained that he would defer to Doximity's representations about Doximity's active members, as Defendant Tangney presumably "knows the actual numbers." Piper Sandler added in its report following the November 9, 2021 earnings call that, while the market previously had been "concerned about member engagement levels," Doximity "put these concerns to rest with their FQ2 report on 11/9." And, following Defendant Tangney's representation that Doximity had 80% of U.S. doctors as active members, Jim Cramer—the host of *Mad Money* on CNBC and an anchor on *Squawk on the Street*—told investors that "I remain convinced that doctors love [Doximity], so buy, buy, buy."

---

[29] *See, e.g.*, reports from RipShowStocks; Funstocks/bestcurrency.eth; Matevoux.

**D.      Doximity Regularly Touted Increased Engagement Across Its Platform, Including on the Newsfeed**

78.     Defendants bolstered their representations to investors that over 80% of U.S. doctors were active members with additional assurances that member engagement was "***increasing***" across the platform, including on the Newsfeed. As with Defendants' representations about the number of active members on the platform, analysts were acutely focused on its members' engagement on the platform—and, in particular, the Newsfeed section where Doximity showed its customers' advertisements. This is because the greater engagement a social media platform has on the portions of its platform that feature advertisements, the more advertisers will buy digital advertising space on the platform.

79.     Throughout the Relevant Period, Defendants represented to investors that the level of engagement on the Doximity platform continued to increase, hitting "***record highs***" each quarter. Defendants added how, importantly, this record growth in engagement occurred "***across our entire platform***"—including, most notably, on the Newsfeed.

80.     For example, during the Company's second earnings call as a public Company on November 9, 2021, Defendant Tangney told investors that user "***engagement with our Newsfeed has never been higher***." Then, on May 17, 2022, Defendant Tangney stated during the earnings call that "***[o]ur usage … hit fresh high[s].***" On the next earnings call on August 4, 2022, Defendant Tangney again assured investors that "***our engagement has never been higher,***" adding that "***[a]cross all these uses, our mobile app unique weekly active users grew last quarter to 5 times the level we had just four years ago***." Yet again, on the February 9, 2023 earnings call, Defendant Tangney told investors that Doximity achieved "***all time high*** network usage in Q3," with its "quarterly active users … hit[ting] an ***all-time high*** last quarter ***across our entire platform***." And on the May 16, 2023 earnings call, Defendant Tangney again stated that "[o]ur usage ***hit fresh***

**high[s] in Q4**" and "**[a]cross our entire platform**, we achieved a **record number of quarterly active users**." Defendant Tangney concluded by stressing that "[w]ith consecutive quarters of record provider engagement **across our entire platform**, I personally have never been more excited about what we're building."

81.    Analysts credited Defendants' repeated representations each quarter about increased engagement "across the entire platform," including on the Newsfeed. In so doing, they accepted Defendants' refutation of anecdotal accounts appearing in isolated analyst reports that reported on "conversations" with medical professionals claiming that "their primary usage of [Doximity] is via the Dialer telehealth feature rather than scrolling the Newsfeed" and that the platform was "more like a telehealth solution than a place where members spend time viewing the newsfeed – and thus ads."[30] As Piper Sandler explained in accepting Defendants' denials of these anecdotal reports, while "[t]he market was concerned about member engagement levels … heading into FQ2 earnings," Defendants "**put these concerns to rest** with their FQ2 report on 11/9, which saw the **highest news feed engagement levels to date**."

82.    Other securities analysts also accepted Defendants' representations touting the supposed "increased" engagement across Doximity's platform. These analysts highlighted this "increased" engagement as a reason to continue to buy the Company's stock. For example, on August 4, 2022 analysts at Jefferies recommended investors "BUY" Doximity's stock despite somewhat disappointing sales results that quarter; part of the "silver lining" cited as the basis for their recommendation was Defendants' representation that "physician engagement on the platform is at all-time highs, creating strategic value."[31] Similarly, in their research reports, analysts at Bank

---

[30] October 14, 2021 J.P. Morgan Analyst Report at 1.
[31] August 4, 2022 Jefferies Analyst Report at 1.

of America highlighted Defendant Tangney's representation that "weekly active users is 5x the level a few years ago" as a reason to continue to buy Doximity's stock, despite any macro-headwinds.[32] Likewise, analysts at Canaccord Genuity, in detailing why they remained "bullish" on Doximity, explained that "given Doximity's strong member base and increasing engagement, we fully expect respectable growth going forward."[33]

83.     Investors continued to credit Defendants' representations about Doximity's supposed "record" and "increasing" engagement during the remainder of the Relevant Period. Following the August 2022 earnings calls, analysts at Berenberg Capital Markets highlighted Doximity's "record engagement" and, on that basis, concluded that Doximity was "still positioned as one of the best tools to market to [health care providers] and should be a share-gainer versus peers near term."[34] In its November 2022 report, Wells Fargo analysts also noted that Doximity's "higher engagement" was central to their recommendation that investors continue to buy the Company's stock.[35] Likewise, in its March 2023 reports, Piper Sandler analysts highlighted Defendants' representation that Doximity's "engagement hit all-time highs during F3Q23," with "engagement" on the platform identified as one of the "cornerstones of a durable network."[36] Through Defendants' repeated representations, investors believed engagement had continued to increase to "record numbers," including on the Company's all-important Newsfeed.

---

[32] August 4, 2022 Bank of America Securities Analyst Report at 4.
[33] August 4, 2022 Cannacord Genuity Report at 1.
[34] October 5, 2022 Berenberg Capital Markets Report at 1.
[35] November 11, 2022 Wells Fargo Analyst Report at 1.
[36] March 9, 2023 Piper Sandler Analyst Report at 3, 5.

**E.    Unknown to Investors at the Time, Doximity Overstated Its Active Members and Falsely Touted Its "Increasing" Engagement**

84.    Unknown to investors during the Relevant Period, Defendants' statements touting how "over 80%" of U.S. doctors were "active members" and how engagement continued to "increase" during the Relevant Period "across the platform" were false and omitted material information. In truth, Defendants: (i) overstated the number of U.S. doctors who were active members by *more than 65%*; (ii) concealed that *less than half* of U.S. doctors on the platform actually used the all-important Newsfeed on a quarterly basis; and (iii) falsely represented that engagement was increasing when, in truth, it was *decreasing* across the platform, including on Newsfeed. As discussed below, the true facts were concealed from investors, but known to Defendants—including through a "Dashboard" ordered by Defendant Tangney that displayed the true facts in real-time to him and his colleagues.

**1.    Doximity Overstated The Number Of Active Members On Its Platform And On Its All-Important Newsfeed**

85.    Defendants repeatedly represented throughout the Relevant Period that over 80% of U.S. doctors were "active members" of the platform, which Doximity defined as members who used the platform on, at minimum, a quarterly basis. However, this claim was false, as a far lower percentage of U.S. doctors were active members on the Doximity platform.

86.    As shown in the Related Securities Action, numerous former Doximity employees who worked with Doximity's customers as well as with its engagement data confirmed that the 80% figure that Defendants repeatedly touted was untrue.[37] FE 1, who as a Client Services Manager was privy to information about how customers' ads were performing, reported that

---

[37] References to former employees that provided information to counsel in the Related Securities Action appear as FE __.

"***there's no way***" that 80% of U.S. doctors were active members of the Doximity platform, and

that, in internal discussions during his time at Doximity, he ***never*** heard reference to the statistic

that 80% of physicians were active members of the platform.[38] Similarly, when asked about the

veracity of Doximity's representation that 80% of U.S. doctors are active members on the platform,

FE 2 stated "***[t]here's no way … there's absolutely no way.***"[39] FE 3, who monitored the degree to

which Doximity members engaged with direct messages, when asked about Doximity's

representation that 80% of U.S. physicians were active members of the platform, also said "***[t]hat's***

***false.***"[40] FE 4, who was the Chief Operating Officer of Doximity's recruiting business shortly after

the Relevant Period and who reviewed the click-through rate for messages to Doximity members,

stated his belief that Doximity's claim that over 80% of U.S. physicians were active members of

---

[38] FE 1 was a former Client Services Manager ("CSM") at Doximity from January 2020 through April 2022. FE 1's role included communicating and being a liaison between Doximity's pharmaceutical clients and the internal Doximity teams (writers, sales representatives, engineers, and others) to get the programs that the pharmaceutical companies had approved and signed up for created and live. FE 1 worked primarily with the sponsored advertisements on the main Newsfeed. In his role, FE 1 had access to and utilized Doximity's Dashboard, which showed user engagement data. FE 1 reported to Sean Johnson, who during FE 1's tenure was a Director, of Client Services from February 2020 through March 2022 and a Senior Director from April 2022 through April 2023; Johnson is currently the Vice President, Client Services. In order to preserve the identity of former employees who provided reports for this Complaint, "he/him/his" pronouns are used throughout.

[39] FE 2 worked as a Recruiter at Doximity from January 2023 through December 2023. In that role, FE 2 was responsible for recruiting physicians for hospitals and other health systems. FE 2 was positioned to know what percentage of Doximity members were active members; as a Recruiter, he tried to contact doctors on Doximity's network to fill job postings.

[40] FE 3 was a Partner at Doximity's recruiting business from July 2022 through February 2024. FE 3's responsibilities included business development, transacting executive searches, contracting through the Chief Legal Officer and the Chief Financial Officer at Doximity corporate, and overall being a general partner in the executive search business. As part of his responsibilities, he reviewed physician responses to job placements, including by viewing the click through rates on ads for job placements. FE 3 reported first to Arthur Cooper, President, Executive Search, then to Jason Babb, who from June 2022 through September 2023 was Regional Director of Business Development and from October 2023 through June 2024 was Regional Vice President of Sales, and then to Craig Overpeck, Senior Vice President, Commercial Operations.

Doximity was a "*flat-out fabrication*."[41] FE 5, who used Doximity's Dashboard on a weekly basis from January 2021 to June 2024, confirmed that Defendants' 80% figure was *not true* based on his experience running weekly engagement reports.[42] And FE 6, whose role as a Business Analytics Manager left him particularly well-placed to know Doximity's true user engagement figures and who utilized Doximity's internal Dashboard, likewise reported that his recollection also was consistent with there being *less than* 80% of U.S. physicians as active members on the Doximity platform, adding also that it was *significantly lower* on the Newsfeed.[43] In fact, Doximity's active concealment of its lower user engagement from Doximity's customers was so troubling to FE 6 that it ultimately caused him to quit his job.

87.     To determine the actual percentage of U.S. doctors who were active members of the Doximity platform, counsel in the Related Securities Action conducted a robust and statistically sound survey of U.S. doctors. To conduct the survey, 3,000 National Provider

---

[41] FE 4 was Chief Operating Officer at Doximity's recruiting business, from late September through November 2023. Prior to joining, he worked at AMN Healthcare, a healthcare staffing company, for 25 years. In his position, FE 4 reviewed reports that featured the click-through rate for job placement ads.

[42] FE 5 held a variety of positions at Doximity's recruiting business, specifically in Business Development, from 2021 through June 2024. FE 5 was promoted to Regional Director of Business Development from June 2022 through September 2023 and was Regional Vice President of Sales for the remainder of his tenure. In his roles, FE 5 had access to Doximity's Dashboard, internally referred to as "WAND," which he used in generating reports for discussions with hospitals seeking physicians.=

[43] FE 6 was a Business Analytics Manager at Doximity from March 2021 through November 2023 and was promoted to Senior Business Analytics Manager for the last month of his tenure. As Business Analytics Manager, he was responsible for managing analytics for some of the key pharmaceutical companies who would then advertise on Doximity and was primarily managing analytics campaigns for the purpose of maintaining customers or growing their customer base. In his role, FE 6 had access to Doximity's Dashboard. If a pharmaceutical brand reached out and asked how its campaign advertising campaign was performing on the platform, FE 6 would work with analysts to pull the data that would show if it was doing well. FE 6 reported to Jeff Gambino, Vice President, Data Analytics.

Identifiers ("NPIs") were randomly selected, which are unique ten-digit identifiers issued to U.S. doctors by the Centers for Medicare & Medicaid Services. These 3,000 NPIs were randomly chosen from a list of 17,262 NPIs of doctors who have agreed to participate in market research. An electronic invitation was then sent by the market research firm, Enos Answers, to each of these U.S. doctors inviting them to participate in the survey. To avoid any potential biases, the survey invitation and survey did not indicate the purpose of the survey, other than state that it concerned "healthcare." The doctors who voluntarily participated in the survey all agreed to answer truthfully to each of the questions presented and were compensated $5 for their time, regardless of the substance of their responses.

88.     First, each doctor was asked to confirm that they were a "U.S. licensed physician throughout the period between June 24, 2021 and August 8, 2023," *i.e.*, during the Relevant Period. The respondents all provided this confirmation. Next, the doctors were asked "[w]hich of the following platforms did you use during the period of June 24, 2021 through August 8, 2023," *i.e.*, during the Relevant Period. The choices presented to the doctors included "LinkedIn," "Sermo," "Doximity," "WebMD," "Facebook," and "None."

89.     The U.S. doctors who reported that they had used the Doximity platform at least once during the Relevant Period were then asked the following question: "During the period of June 24, 2021 through August 8, 2023, did you use the Doximity platform less than once every three months?" Of the doctors who used the Doximity platform during the Relevant Period, ***over one third*** of them (34.2%) reported that they used the platform ***less than once a quarter***. Including the doctors who did not use Doximity at all, ***more than half*** of all U.S. physicians (51.7%) either ***never*** used Doximity or did so on a less-than-quarterly basis—*i.e.*, they were ***not*** "active members" based on Doximity's own definition of the term. Accordingly, Defendants' "over 80%" figure that

they repeatedly touted to investors throughout the Relevant Period **overstated by over 65%** the true number of U.S. doctors who were active members of the Doximity platform.

90. Those U.S. doctors who used the Doximity platform during the Relevant Period were then asked whether they ever used the Newsfeed on the Doximity platform during the Relevant Period and, if so, whether they used Doximity's Newsfeed at least quarterly. The results demonstrated that, of the U.S. doctors who used Doximity during the Relevant Period, approximately **one-fifth** of them (19.2%) **never** used Doximity's Newsfeed at all during the Relevant Period and **forty-five percent** (45%) used the Newsfeed **less than once a quarter.**

91. To ensure that the survey's results may be properly extrapolated to the population of U.S. doctors as a whole, counsel in the Related Securities Action designed the survey with a large enough sample size to ensure it produced statistically reliable results, in accordance with the prevailing standards for survey research. The survey was completed by 681 U.S. doctors, 500 of whom used the Doximity platform at least once during the Relevant Period. Given the number of respondents, the survey results can be stated with a 95% confidence level.[44] A confidence level of 95%, such as here, is consistently regarded as the "gold standard" for surveys in academic and industry research.[45] As Timothy Chan, a former data scientist at the social media platform Facebook, explained, the 95% confidence level has been the "standard from the very start of modern statistics," as it is high enough to "remove[] 95% of potential false positives" while being an "achievable benchmark for most fields of research to remain productive." Chan further explained that a 95% confidence level, as selected here, is "unbiased" because its selection

---

[44] To calculate the sample size required for a 95% confidence level with a given margin of error, *see* Sample size calculator, https://www.surveymonkey.com/mp/sample-size-calculator/.

[45] *How Many Participants for Quantitative Usability Studies: A Summary of Sample-Size Recommendations*, NNGroup.com (Jul. 25, 2021); Tim Chan, *Understanding the Role of the 95% Confidence Interval*, Statsig.com (Aug. 4, 2022) [hereinafter "*95% Confidence Interval*"].

demonstrates that the survey conductor has "decided to play by the same rules that others play by," in addition to being "ubiquitous" and "ensur[ing] we're all speaking the same language."[46] Meanwhile the margin of error for the results was approximately 4%.[47] A margin of error near 4% is also a significant sign of the survey's reliability: as experts in survey and analytics have explained, "[t]he most commonly acceptable margin of error used by most survey researchers falls between 4% and 8% at the 95% confidence level."[48]

92.     Other studies, such as the study conducted by Dr. Sarah Smith of Westchester Medical Center, corroborate that Doximity overrepresented the number of U.S. doctors who were active members on its platform. In mid-August 2023, Dr. Smith published an independent study in the *Journal of Graduate Medical Education* titled "***Program Misrepresentation in the Doximity Residency Navigator***." Reviewing the anesthesiology residency program at Westchester Medical Center's current residents and graduates, the study demonstrated that a startlingly high percentage of the "user profiles" of the "members" on the Doximity platform contained basic errors—a strong reflection of the fact that the "members" were ***not*** actively engaged on the platform. The study documented how "***a large majority*** of Doximity profiles of the program's residents and alumni had inaccuracies," including 65% of graduates and 83% of current residents.[49] These inaccuracies were not minor, but included outdated and incorrect descriptions of the profile owners' medical residency, specialty (*i.e.* type of practice), and fellowship. "Most strikingly," the study concluded, of the current residents identified as "members" of the Doximity platform, Dr. Smith found that

---

[46] *Id.*

[47] For computing the margin of error, *see* Margin of Error Guide & Calculator, Qualtrics.com, https://www.qualtrics.com/experience-management/research/margin-of-error/#:~:text=A%20 larger%20standard%20deviation%20means,How%20Qualtrics%20can%20help.

[48] *Margin of Error: How to Find and Reduce It?*, Voxco.com.

[49] Jehoshaphat Report at 42.

*75%* of their profiles did not even correctly list the doctors' residency programs, which further indicated that these "members" were not actively using the Doximity platform.[50] Based on her study and experience, including discussions with other doctors, Dr. Smith concluded and told counsel in the Related Securities Action that it was "*impossible*" that 80% of U.S. doctors were active members of Doximity.[51]

93.     The account of FE 2, who reviewed Doximity members profiles in his role as a Recruiter at Doximity from January 2023 to December 2023, offers further support for the results of Related Securities Action's survey of U.S. doctors and the Westchester Medical Center study. As FE 2 explained, basic information about Doximity's "active members" in the Doximity's platform was wrong and outdated. Consistent with Dr. Smith's findings, FE 2 reported that *more than half* of the listed phone numbers and email addresses of Doximity's "active members" were either not filled in or were inaccurate. FE 2 added that member email addresses would often be years old and wrong, estimating based on his experience that *approximately 40%* of the basic information (*i.e.*, phone numbers and email addresses) for "active members" was not filled in, and *an additional 20-30%* of this basic information about the "active members" was inaccurate.[52] As analysts from Jehoshaphat Research noted after the conclusion of the Relevant Period, it is "unfathomable" that active members would allow these kinds of errors to persist—indeed, "the

---

[50] Sarah Smith and Apolonia Abramowicz, *Program Misrepresentation In the Doximity Residency Navigator*, 15 J. Grad. Med. Educ. 436, 436 (Aug. 2023).

[51] Dr. Smith is a Clinical Associate Professor of Anesthesiology at Westchester Medical Center.

[52] FE 2 explained these percentages of inaccurate and missing information about the "active members" remained the same throughout his tenure, which lasted from January 2023 through December 2023. FE 2 added that job placements that were filled through Doximity were also down during his tenure precisely because of the lack of engagement from the "members" who supposedly used Doximity.

higher the error rate in the profiles, the *lower* the percentage of profile 'owners' who have shown up to correct the errors in their profiles."

94.    The click-through rate for messages placed on the Doximity platform further corroborate that far less than 80% of doctors were active members. At Doximity, a click-through rate measures how many recipients of a message actually click on the message after seeing it. FE 3 was able to see the click-through rate for his business offering—executive search, clinical search, and the staffing business. FE 3 explained that the click-through-rate was consistently low throughout his tenure, which began in July of 2022 and lasted until after the Relevant Period. Indeed, FE 3 explained that the click-through rate showed that, on average, only **8%** of Doximity's members clicked on Doximity's messages containing job positions. FE 3 further explained, based on his 17 years of experience in executive searches, that if 80% of U.S. doctors were using Doximity's platform, he would expect a click-through rate of at least 30%—*i.e.*, over ***three-times*** the actual click-through rate on the platform. FE 4 corroborated FE 3's account, confirming that the click-through rate on messages in the Doximity platform was in the high single digits, which is inconsistent with 80% of physicians being active users of Doximity. FE 4 likewise reported that he too would expect a click-through rate of approximately 30% (*i.e.*, over three times the actual click-through rate) if 80% of U.S. doctors were active members on the platform.

### 2.    Doximity's Internal Dashboard Showed That the True Number of Active Members Was Far Less Than Defendants Represented

95.    The true facts about Doximity's "active members" were known and readily viewable across the Company, including through an interactive and proprietary Dashboard available to the Company's executives, including Defendant Tangney. Indeed, as FE 6 noted, the

Doximity Dashboard showing the true number of active members was created at the personal request of Defendant Tangney himself.[53]

96.    FE 6, the Business Analytics Manager at Doximity from March 2021 to November 2023, described how Doximity had an internal dashboard that was accessible to, among others, Defendant Tangney as well as his supervisor Jeff Gambino (Vice President, Data Analytics).[54] Gambino headed FE 6's business analytics team. FE 6 described how the Dashboard showed member engagement levels on a quarterly basis in real time or close to it. The Dashboard, among other things, showed the count of quarterly active users divided by total users on the platform for any given quarter and showed the percentage of members who were active based on that definition. The Dashboard specifically allowed a Doximity employee to view the number of overall active members, including their level of activity on a daily, monthly, and quarterly basis.

97.    FE 1, the Client Services Manager ("CSM") at Doximity from January 2020 to April 2022, also reported that there was an internal Dashboard that she had access to and would sign into. FE 1 also confirmed that everyone in his department (*i.e.*, the client services department), the sales department, the development team, and Doximity's CFO and CEO had access to the Dashboard and could check the engagement metric. FE 1 reiterated that Doximity's CEO and CFO "100%" would have access to that Dashboard and that, on the Dashboard, one could see the number of overall active members. FE 1, like FE 6, confirmed that the Dashboard showed the number of

---

[53] At Defendant Tangney's direction, Priya Manivannan created and implemented the dashboard. Ms. Manivannan was a member of on FE 6's team.

[54] FE 6 was responsible for managing the analytics accounts for some of the key pharmaceutical companies who would then advertise on Doximity's platform on the app. FE 6 worked with some of Doximity's big clients, including Merck (which at the time was Doximity's biggest client) and Lilly.

overall active members, including the percentage of their usage on a daily, monthly, and quarterly basis.

98.     Additional Doximity executives have confirmed that Doximity tracked the number of Doximity active members on the Dashboard, which Defendant Tangney could and did access. For example, Doximity's Co-Founder and Chief Product Officer, Shari Buck, confirmed that Doximity had a Dashboard, internally referred to as "WAND," that specifically tracked "active users," measured on a quarterly basis.[55] Ms. Buck explained that the Dashboard offered a "snapshot of [Doximity's] network vitality," providing Doximity's executives with the "immediate" ability of "knowing what is going on in the network." Ms. Buck added that "data" is Doximity's greatest asset; that "show me the data" is one of Doximity's core values; and that "almost every decision [Doximity] make[s] is backed up and powered by [its] data."

99.     Dr. Bushra Anjum, the former Director of Data Science and Data Analytics at Doximity from October 2022 to May 2024, also reported that Doximity had an "interactive multi-level dashboard" that tracked user engagement, and specifically tracked usage on Doximity's "Newsfeed."[56] Dr. Anjum also explained that, because Doximity's "revenue generation model is ads," it was important for the Company to "track[] the activity on ads."[57] Dr. Anjum added that "[a] diverse audience uses our dashboard" and that, in particular, Defendant Tangney, Doximity's "CEO [was] interested in overall user engagement and product growth, and adoption." Dr. Anjum confirmed that the Dashboard included Doximity's "actual data." Dr. Anjum added that the Dashboard could be filtered by such criteria as "credentials" and physician "specialty," ensuring

---

[55] Shari Buck, Unveiling Doximity's Success: Crafting a Physician-Centric Platform (2019).

[56] Bushra Anjum, *Stars and Dimensions: Data Modeling for the Analytics*, Technology.Doximity.com (Feb. 25, 2020).

[57] Stars, Dimensions, & Stories: Bushra Anjum, Ph.D., Doximity (youtube.com).

that Doximity was able to specifically determine the number of physicians who were active members of the platform.

100.    FE 5, who regularly used Doximity's Dashboard, confirmed that Defendants' 80% figure was *not true*. FE 5 confirmed that WAND, which was the primary dashboard that Doximity used for accessing and showcasing engagement data, showed (among other things) the percentage of U.S. doctors that were quarterly active users by specialty nationwide. FE 5 explained that, throughout his tenure, he used WAND multiple times each week to look at the percentage of active users for 20 to 25 physician specialties, which accounted for approximately three quarters of all U.S. doctors. FE 5 explained that, in *all* such instances, the percentage of quarterly active U.S. doctors, as reflected in the Dashboard, was below 80% for *all* of the types of doctors that he viewed. FE 5 explained that his role in business development involved his looking at engagement data on WAND multiple times per week for these 20 to 25 physician types, which included, among other specialties, primary care (including Family Medicine, Internal Medicine, Obstetricians, and Pediatrics) and other physician specialties (*i.e.*, types, including general surgery, psychiatry, radiology, and neurology). FE 5 confirmed that during his tenure—which encompassed the entire Relevant Period—when he looked at WAND, the number of quarterly active members was *always* below 80% for *every physician specialty that he reviewed*.

101.    Defendant Tangney demonstrated his knowledge of the true, undisclosed number of "active members" on the platform, including on Newsfeed, during the Company's regular offsite meetings. FE 6 confirmed that Defendant Tangney personally presented engagement metrics, including quarterly active members, during the Company's offsite meetings, which took place three to four times per year. FE 6 added that, at these offsites in which Defendant Tangney would discuss active member and engagement metrics, the amount of quarterly active members was

always provided as an update. FE 6 recounted that during the Company offsites Defendant Tangney would also present whether a particular channel (*e.g.*, Newsfeed) was being used more or less often. The metrics that Defendant Tangney presented during these regular offsite meetings were consistent with what was reflected in the Company's Dashboard—*i.e.*, the actual number of active members and engagement. FE 6 confirmed that general trends in user engagement were also within Defendant Tangney's purview, and that Defendant Tangney would also present these metrics to employees at the quarterly offsite meetings.[58]

102.     Through their access to the Dashboard, Defendant Tangney and Doximity's executives knew that the Company was materially overstating the number of active members on the platform, including on the Newsfeed. Doximity's other employees knew it too. FE 6 explained that it was "definitely" a topic of conversation and a concern at the Company that the number of active members using the Newsfeed was significantly below 80% of the U.S. physician population.

### 3.     User Engagement Continued to Decline on the Platform Throughout the Relevant Period, Including on the Newsfeed

103.     In addition to representing that 80% of U.S. doctors were active members of the platform, Defendants also represented that user engagement "increased" every quarter and was consistently reaching "record" highs "across the platform," particularly on the Newsfeed. Unknown to investors at the time, these representations were false and highly misleading. In truth, user engagement was ***declining*** throughout the Relevant Period and across the entire platform, including on the Newsfeed, which adversely impacted the Company's ability to complete upsells.

104.     Numerous former Doximity employees have reported that user engagement on the platform was decreasing throughout the Relevant Period, including on the Newsfeed. FE 1

---

[58] FE 6 added that his team at Business Analytics provided Defendant Tangney with some of the inputs he would utilize in the presentations.

specifically reported that engagement across the board was declining by January 2022 and continued to decline until he left the Company in April 2022. FE 7, who began working as a Business Development Representative at Doximity in August 2022, likewise reported that, from the start of his tenure as a Business Development Representative until he left in August 2023, user engagement was declining across the platform.[59] And FE 6 reported declining engagement rates by at least November 2022, with the decline in engagement—along with anxiety about how to hide that fact from customers—continuing until he left the Company in November 2023.

105.    Former Doximity employees also confirmed that the Company internally recognized and specifically discussed the decline in engagement across the platform. For example, FE 1 reported that the decline in user engagement was discussed regularly at the Company. FE 1 specifically recalled how, beginning in January 2022, his team saw a decrease in engagement and in particular deep engagement, and that the decrease in engagement was discussed at a weekly Client Services Manager meeting around January 2022. FE 1 also recalled that, beginning in January 2022, the Slack channel (in which client service managers communicated) "erupted" every hour with discussion and concern surrounding the decrease in engagement levels. FE 1 explained that everyone on his team could see these discussions, and these discussions occurred daily. FE 1 specifically recalled that Doximity's Chief Financial Officer Anna Bryson, a direct report to Defendant Tangney, participated in a meeting in January or February 2022 during which there was

---

[59] FE 7 was a Business Development Representative at Doximity from August 2022 until August 2023 and, in that role, communicated with potential customers in order to convince them to purchase ads from Doximity. FE 7 received performance feedback from Doximity executives Jeff Eaton (Senior Vice President, Head of Sales for the Life Sciences Business Unit from February 2022 until April 2023, and from April 2023 until July 2024 the Senior Vice President, Life Sciences Business Unit Leader, currently the Senior Vice President, Head of Sales and Revenue, Life Sciences Business Unit) and Joe Kleine (Advisor to the Chief Executive Officer of Doximity's recruiting business from April 2022 until January 2024).

discussion about how user engagement was declining. FE 1 recounted that Bryson exhibited during the meeting that she already knew that user engagement was declining. Bryson's knowledge of declining user engagement indicated that the matter had been brought to the highest levels of the Company, which would include Defendant Tangney.

106.    Additional employees have confirmed that the decline in engagement continued throughout the remainder of the Relevant Period. For example, FE 7, who started at Doximity in August of 2022 and was responsible for bringing in business from pharmaceutical companies seeking to place ads on Doximity's Newsfeed, explained that user engagement across the platform was significantly declining on the Doximity platform during his entire tenure at the Company. FE 7 further reported that it was not just the number of active members declining, but also the amount of time that members were spending engaged in the Newsfeed, which was the largest source of revenue for the Company. FE 7 added that there was also a drop off, including on the Newsfeed, in deep engagements, which measures more active participation from members of the platform. The fact that deep engagement was dropping on the Newsfeed was a particular concern, FE 7 explained, because the Newsfeed was Doximity's selling point and main moneymaker.

107.    FE 6, a Business Analytics Manager and a Senior Business Analytics Manager from March 2021 until November 2023, also recounted how engagement was declining across the platform during at least the last year of his tenure, from November 2022 to November 2023. Like FE 7, FE 6 also recounted how overall deep engagement was also going down during this period and specifically on the Newsfeed.

108.    The decline in user engagement was widely discussed among concerned Doximity employees. FE 7 explained that there were monthly update emails sent from the Product and Data Analytics groups at Doximity to the entire Sales Department, including FE 7, to keep them

informed. These emails reflected that user engagement was declining, with the declines across the entire platform—including, specifically, on the Newsfeed. These monthly update emails further reflected that the percentage of users who were deeply engaged was declining. FE 7 recounted that Doximity's Product and Analytics teams expressed concern that they were not getting as much engagement and that, as a result, revenue was going to drop.

### 4. Doximity's Customers Reduced Their Advertisement Spend On The Doximity Platform Due to Concerns About User Engagement With Their Ads

109.    In a telling sign that user engagement was declining, Doximity's customers began to increasingly question the effectiveness and value of their advertisements on the Platform as the Relevant Period progressed. In particular, Doximity's customers began to question whether the user engagement on Doximity's Newsfeed would allow them to achieve the return on investment on their ads that Doximity had promised and that they had expected.[60]

110.    Doximity's customers had only partial access to engagement figures with their specific ads. FE 7 explained that Doximity maintained specific data on a customer's advertisement or specific piece of content and was able to share with its customers this data, including deep engagements, clicks, look-throughs, how many people read an article, how long people spent reading an article, and how many people followed a link in the article. FE 7 reported that customers could receive engagement reports for their specific ads, through which they could see the performance of their ads after a time, and as a result customers were aware of how their ads were performing and saw that the user engagement numbers were not at the level the customers

---

[60] Doximity told investors that its median ROI for its customers' advertisements was 10 to 1 or more—meaning that, according to Doximity, for every dollar that its customers spent on Doximity, they would earn $10 or more on sales of their products.

expected. FE 7 further explained that he participated in calls and updates to customers and heard concerns from customers about the engagement the customers believed they should be getting as opposed to what they were actually getting for their ads.

111.    Doximity was concerned that customers would not only learn engagement was declining for their ads, but across the entire platform. FE 6 explained that one metric that Doximity was particularly unwilling to disclose to customers was the low member engagement levels on the Newsfeed. As FE 6 explained, customers had an assumption that most of the user engagement on the platform was happening organically within the Newsfeed, when it was not. FE 6 knew this was an assumption of customers because he spoke with the Sales Department about it when he first joined the Company; members of the Sales Department told him that when most clients come into contracts and a relationship with Doximity, they naturally think that engagement is coming from people in the Newsfeed clicking on something. FE 6 explained that the concern at Doximity was that, if clients were to ask for Newsfeed metrics specifically and see that they were not as high as the overall engagement metrics across the platform, then they would instead advertise with one of Doximity's competitors.

112.    Doximity's response to these unfavorable engagement figures—including the unfavorable Newsfeed engagement figures—was to conceal them from customers. FE 6 explained that this instruction—*i.e.*, to avoid disclosing the low level of engagement on the Newsfeed, and to steer customers to other metrics—caused concern for him and his team, including the Business Analytics Managers that FE 6 worked with at the time. FE 6 added that the Business Analytics Managers shared experiences from their accounts with FE 6, and the need to avoid providing these metrics to Doximity's customers was a common experience and concern for the whole analytics department at Doximity. FE 6 explained that, starting in approximately November 2022, both he

and other Business Analytics Managers repeatedly raised this concern both among themselves and to Jeff Gambino. Specifically, FE 6 described how there were multiple times starting in November 2022 in which he raised concerns to Jeff Gambino that the Company was not providing key metrics of engagement on Newsfeed to its clients. Between his reports to the sales department and Gambino, FE 6 recalled that he reported his discomfort no fewer than ten times, including raising concerns to Gambino specifically at least five times. FE 6 explained that this same concern commonly came up during weekly Business Analytics Manager meetings, which Gambino also attended. FE 6 reported that Defendant Tangney knew of the concern that they were not providing customers with newsfeed engagement numbers because they were poor, and that such concerns were raised to Defendant Tangney in April or May of 2023.

113.    Customer concerns with engagement, and how to avoid them by hiding unfavorable engagement metrics, involved some of Doximity's key customers and were escalated to Defendant Tangney. FE 6 explained that in April or May of 2023, Doximity personnel engaged in careful discussions about what metrics to provide to Merck, a key client. FE 6 explained that in the past, Doximity reported to Merck the number of total engagements over certain time periods, and the number of engagements broken out by specialty, but scrapped the way they used to report to Merck because the number of unique engagements for its ads was not going up and, if anything, was declining. In the spring of 2023, the user engagement metrics caused concern and ultimately "panic" among the team working on the account. FE 6 recalled that he escalated the issue to Gambino, who confirmed in conversations with FE 6 that Defendant Tangney had been informed about the situation with Merck, with Gambino providing comments along the lines of "Jeff is aware." Defendant Tangney was therefore aware that a major customer was pressing for

information about Doximity's engagement figures that it did not want to divulge, and aware of Doximity's efforts to conceal the true engagement data.

114.    As the Relevant Period wore on and engagement on the platform and Newsfeed declined, customers increasingly challenged Doximity on whether the platform could really justify their return on investment ("ROI"). In order for a doctor to count as a positive return on investment for an ad, the doctor must interact with the customers' advertisement campaign. FE 6 confirmed that if providers were not engaging, it would absolutely impact ROI. For example, FE 6 explained how, after November 2022, the pharmaceutical company Lilly told FE 6 that it had run an independent analysis on the benefits Doximity delivered to its advertising campaign and discovered a *negative* ROI—which meant Lilly *lost* money by advertising on Doximity's platform. FE 6 explained that Doximity subsequently ran the results and could only confirm what Lilly had reported. FE 6 immediately escalated the issue to Jeff Gambino.

115.    Ultimately, FE 6 could no longer tolerate the growing discomfort with how Doximity was handling its reporting of user engagement to its clients. As FE 6 explained, there is just so much diversion you can do. Accordingly, he quit Doximity.

116.    Doximity's customers increasingly became concerned with the level of engagement on the Doximity platform. FE 1 offered a unique perspective on the issue given that, in 2022, FE 1 left Doximity to work for Novo Nordisk, a healthcare company focused on treating certain chronic diseases that, for example, produces half of the world's insulin supply.[61] FE 1 stated that Novo Nordisk was a Doximity client that previously advertised on the Doximity platform. During FE 1's discussions with Doximity (from the customer's end), Doximity refused to provide the information the Novo Nordisk team requested to run their own analytics to check on the level of

---

[61] *See What We Do*, NovoNordisk.com, https://www.novonordisk.com/about/what-we-do.html.

engagement on the Doximity platform. FE 1 explained that, as a result, his boss at Novo Nordisk questioned Defendant Tangney about user engagement rates on the Doximity platform over a dinner (also attended by FE 1), which resulted in Defendant Tangney leaving the dinner. After Tangney left, FE 1's boss told him that he merely wanted to know about Doximity's engagement numbers and how they got there, but Tangney told him to reach out to his Doximity sales representative and they could handle it, after which Tangney abruptly left. As a result, as FE 1 explained, his team at Novo Nordisk decided to stop advertising with Doximity toward the end of 2022 because the numbers presented by Doximity were inflated, and Doximity refused to provide the requested information. As FE 1 explained, his boss at Novo Nordisk thought that Doximity's engagement numbers were "complete BS."

117. The lower-than-represented member engagement on the Doximity platform caused customers to reduce and, in some cases, stop purchasing "upsells" for ad space on the platform. FE 7 commented on this decline in upselling and confirmed that customers spent less money advertising with Doximity when the Company had no choice but to disclose its engagement metrics to customers for their advertisements. FE 7 explained how, based on his experience, customers were not interested in upsells if their current ads were not performing consistent with how they thought they should. FE 7 confirmed that there were customer concerns about user engagement and hesitancy with upsells his entire tenure from August 2022 through August 2023— which he knew based on conversations with both customers and Doximity salespeople. After onboarding a new customer, FE 7 explained, he attended meetings between Doximity and those customers where they consistently reported that they were not going to spend as much with Doximity because of the results in the user engagement reports they received about their ads.

118.    In his Business Development role, FE 7 also attended weekly meetings with Doximity's sales department, where he learned that Doximity employees who were responsible for upsells were not hitting their numbers. FE 7 explained that this was a common theme throughout his entire tenure (which ended in August 2023), but especially throughout the last couple of quarters that he was with the Company. FE 7 explained that it was very clear that user engagement numbers and growth were declining, and there was a concern about how many pharmaceutical companies were investing in ads on Doximity and buying space on the platform. FE 7 confirmed that there was a general sentiment amongst the sales team that they could not complete as many advertising sales because of declining and low user engagement.

## VIII.   THE TRUTH EMERGES

119.    The relevant truth concealed by Defendants' Relevant Period misrepresentations and omissions emerged on August 8, 2023. On that date, Doximity stunned investors by slashing its financial guidance for fiscal year 2024 that it previously provided to investors. Doximity reduced its lower- and upper-end revenue guidance by, respectively, $32 million and $54 million, and reduced its lower- and upper-end EBITDA guidance by, respectively, $7 million and $29 million. Doximity also announced that, as a result, the Company would need to terminate 10% of its workforce.

120.    During Doximity's quarterly earnings call that day after market close, Doximity admitted to a substantial decline in its "upsell close rate"—*i.e.*, a decline in the sale of one-time advertisements on the Newsfeed during the year. Defendant Tangney further admitted that "banner ads" on other social media platforms received its customers' "incremental spend"—in other words, Doximity lost out to its competitors. Defendant Tangney further admitted that "smaller" social

media companies "who are bidding up certain segments of physicians" were providing "a better, frankly, more normalized ROI than what we currently deliver."

121.    Analysts reacted sharply to these disclosures and the Company's results, which they described as "***shockingly short of expectations***."[62] Analysts at Needham and Guggenheim Securities immediately downgraded Doximity's stock from "Buy" to "Hold" and "Neutral," respectively, while Piper Sandler, Bank of America Securities, and Morgan Stanley each substantially lowered their price targets for Doximity's stock in direct response to the revelations. Evercore ISI reported that investors "are likely to remain concerned that programmatic banner ads captured share from DOCS and will weigh further on the long-term growth of the core business."[63]

122.    During the August 8, 2023 earnings call, Defendant Tangney also sought to attribute much of the decline in the "close rate" of upsells to Doximity's sales tactics—and not less-than-represented engagement on the Doximity platform. Analysts and investors, however, did not accept Defendants' stated explanations and recognized the singular, true cause for the decline in upsells: user engagement was not what Doximity had represented during the Relevant Period. For example, in its August 9, 2023 report, analysts at Wells Fargo concluded that Doximity failed to level with investors, explaining "***we don't completely buy***" Defendants' "***explanation that a lack of a self-serve model [plus] market weakness fully explains the large miss to upsell expectations.***" Rejecting the Company's stated explanation, Wells Fargo's analysts "***question[ed] whether [Doximity's] clients are seeing a high enough [return on investment] to warrant putting more ad dollars in later in the year.***"

---

[62] August 8, 2023 Jefferies Report at 1.
[63] August 8, 2023 Evercore ISI Analyst Report.

123.    Analysts at Morgan Stanley also concluded that the decline in upsells was attributable to lower-than-represented engagement on the platform—and ***not*** to a flaw in any sales tactics. In their August 9, 2023 report following the disclosures, Morgan Stanley's analysts told investors that a "stronger re-acceleration in the core newsfeed" was needed to get the Company back to previously-reported revenue growth. Morgan Stanley's analysts further explained how they conducted industry "checks" with Doximity's pharmaceutical and health system customers "to get a fresh pulse on current industry trends" and that, through these industry checks, they found that "company-specific" issues at Doximity resulted in lesser-than-expected upsells. Chief among these issues, Doximity suffered from "***slowing growth in their … user engagement,***" which reduced upsells and forced Defendants to slash their revenue guidance.

124.    Other securities analysts and market commentators also recognized that the decline in Doximity's upsells, and the reduction in its revenue guidance, were attributable to the fact that there were lesser-than-represented active members on the platform. For example, immediately following the Company's August 8, 2023 disclosures, Dr. Tarang Patel—a physician and securities analyst who focuses on healthcare companies—openly challenged the veracity of Doximity's representations, publicly stating to his followers that Defendants' representations about having "***4/5 of doctors***" as active members were "***hard to believe,***" adding "***I've never heard any colleagues say they use Doximity.***"[64] Based on his outreach to doctors following the Company's August 8, 2023 disclosure, he concluded that the "major use" for the Doximity platform was ***not*** Newsfeed (*i.e.*, the only meaningful money-making portion of the platform), but rather its "telehealth" tools that generated no revenue for the Company. Indeed, the majority of doctors who

---

[64] Dr. Patel runs a blog and podcast known as "Doctor Money Matters," which is a "resource for physicians, dentists, and other health professionals . . . to have a place to discuss financial topics." *See* https://www.doctormoneymatters.com/.

responded to Dr. Patel's inquiry reported that they either did not use Doximity or only used it for its telehealth tools—*i.e.*, not the Newsfeed—with many of the doctors questioning Doximity's representations to investors that "over 80%" of doctors were active members.[65]

125.    Over the next weeks, additional securities analysts confirmed the true reason why Doximity slashed its revenue guidance and was unable to complete upsells. On April 1, 2024, an analyst at the research firm Jehoshaphat issued the scathing 57-page Jehoshaphat Report following an in-depth review of Doximity. The Jehoshaphat Report was based on, among other things, "interviews with former employees and digital marketing agencies, analysis of app activity," in addition to a "review of academic research about Doximity's misrepresentations in its profile network."

126.    The Jehoshaphat Report concluded that, contrary to Defendants' representations during the Relevant Period, "***Doximity Engagement Appears To Be Falling.***" The Jehoshaphat Report's findings further undermined Doximity's Relevant Period representation that 80% of U.S. physicians were "active members" of the platform. As the Jehoshaphat Report explained, "***[a]sk around (as we have), and we're confident that you'll find a great number of doctors who 'have' Doximity profiles but don't engage with the platform in any meaningful way***." The Jehoshaphat Report found that Doximity's "active members" were not active at all; rather, the Company "signed up" many of their members through deceptive tactics, including by "using their NPI numbers and then inviting them to 'claim' their profiles." As the Jehoshaphat Report noted,

---

[65] *See, e.g.*, Dr. Harry Giles ("I use the app's phone dialer feature only"); Dr. Smauel Brown ("I got a login because I was supposed to 'vote' in the US News rankings. I suspect there a lot of people like me who are nominally D users but who use it for nothing beyond the U.S News thing"), Dr. Ryan P. Daly ("It's nice to have a Rolodex of contact # and emails of physicians' colleagues. But its not much more than that"); Dr. Daniel J. Ritter ("Use or 'use?' I made a profile in medical school and have never logged in since").

"[s]igning up doctors using their NPI numbers and then inviting them to 'claim' their profiles is a clever way to move towards hopeful engagement, *but actual engagement it is not*."

127.    In addition to its own research, the Jehoshaphat Report brought to the fore the academic study discussed above, published by Dr. Smith in mid-August 2023 in the *Journal of Graduate Medical Education*. As the Jehoshaphat Report explained, Dr. Smith's study, titled "*Program Misrepresentation in the Doximity Residency Navigator*," found that "a large majority of Doximity profiles of the program's residents and alumni had inaccuracies."[66] The Jehoshaphat Report aptly concluded that it was "unfathomable" that "engaged" doctors would allow these kinds of errors to persist—indeed, "the higher the error rate in the profiles, the lower the percentage of profile 'owners' who have shown up to correct the errors in their profiles."

128.    The Jehoshaphat Report further explained that the analyst's "interviews with marketing agencies and former [Doximity] employees suggest" that Doximity provided "*misleading … ROI*" to drug companies that advertise on the Doximity platform, which, contrary to Defendants' representations, were "*declining.*" Citing interviews with marketing executives, the Jehoshaphat Report explained that investors should take Doximity's representations about its customers' return-on-investment for their ads with a "*GIGANTIC* grain of salt."

129.    The Jehoshaphat Report further concluded that engagement at the Company was not only substantially lower than reported, but actively declining. As the Jehoshaphat analyst explained, "*[u]ser engagement with the Doximity platform [] appears to be declining, which would explain declining customer ROIs.*"[67] Because of these and other "fundamental issues" at Doximity, Jehoshaphat explained, the Company's "underlying sales" were also "declining at a

---

[66] Jehoshaphat Report at 42.
[67] *See* https://x.com/JehoshaphatRsch/status/1774795208791581030.

negative -3-6% rate," a decline that Doximity disguised through accelerated revenue recognition—*i.e.*, speeding up the timeframe in which Doximity recognized amounts billed for services to be performed as revenue. In other words, Doximity had papered over the issues caused by customers no longer accepting its lofty engagement claims by "borrowing" money from future revenues to show growth in the current quarters.

130.    Investors were harmed by Defendants' misrepresentations about the number of "active members" and "increasing" engagement across the Doximity platform during the Relevant Period. Following the August 8, 2023, revelations, the price of Doximity's common stock plummeted by nearly *23%*— the largest single-day decline in Doximity's history—wiping out over *$900 million* in shareholder value in one day.

## IX.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE RELEVANT PERIOD

131.    Throughout the Relevant Period, Defendants made materially false and misleading statements in breach of their fiduciary duties owed to the Company and its shareholders. Specifically: (i) Defendants overstated *by more than 65%* the number of U.S. physicians who were "active members" on the Doximity platform during the Relevant Period; (ii) Defendants concealed that, of the U.S. physicians who used the platform, *more than half of them* used Doximity's Newsfeed *less than quarterly* or *not at all* during the Relevant Period; (iii) Defendants represented that engagement across the platform was increasing when, in reality, engagement was *decreasing* across the platform; and (iv) Defendants represented that engagement on Doximity's Newsfeed was increasing and had "never been higher" when, in reality, engagement was *decreasing* on the Newsfeed.

132.    Defendants also omitted material facts when speaking to investors during the Relevant Period, including, among other things, that: (i) *more than half* of all U.S. physicians

either **never** used Doximity or did so on a less-than-quarterly basis; (ii) **over one-third** of doctors who used the Doximity platform did so **less than quarterly**; (iii) **nearly half** of Doximity members that used the platform during the Relevant Period used Doximity's Newsfeed less than quarterly; (iv) approximately **one-fifth** of Doximity members that used the platform during the Relevant Period **never** used the Newsfeed during the Relevant Period; (v) the **majority** of member profiles contained basic errors and omissions, showing a lack of engagement with the profiles; and (vi) Doximity's own internal Dashboard showed that **less** than 80% of U.S. doctors were active members.

133. On the first day of the Relevant Period, Defendant Tangney appeared for an interview on CNBC's TechCheck, a broadcast that focuses on public companies in the technology sector. During the interview, the CNBC interviewer asked Defendant Tangney to introduce Doximity to investors and explain how it became the "Linked-In for doctors." In response, Defendant Tangney stated that "**today we have over 80% of all U.S. physicians as active members on the platform**." In the same interview, minutes later, Defendant Tangney represented "**again, we're over 80% of all U.S. physicians as active members.**"

134. The above statements were materially false and misleading when made. In making these statements, Defendant Tangney overstated by **more than 65%** the number of U.S. physicians who were active members of the platform. Additionally, it was materially misleading for Defendant Tangney to state that "we have over 80% of all U.S. physicians as active members" while omitting that (i) **more than half** of all U.S. physicians either **never** used Doximity or did so on a less-than-quarterly basis; (ii) **over one-third** of doctors who used the Doximity platform did so **less than quarterly**; (iii) **nearly half** of Doximity members that used the platform during the Relevant Period used Doximity's Newsfeed less than quarterly; (iv) approximately **one-fifth** of

Doximity members who used the platform during the Relevant Period **never** used the Newsfeed during the Relevant Period; (v) the **majority** of member profiles contained basic errors and omissions, showing a lack of engagement with the profiles; and (vi) Doximity's own internal Dashboard showed that **less** than 80% of U.S. doctors were active members. As a result of these materially misleading statements and omissions, investors were left with the false and misleading impression that Doximity's user engagement—particularly on its revenue-critical Newsfeed—was significantly higher than it actually was.

135.    On August 10, 2021, Defendant Tangney appeared and spoke on behalf of Doximity at the Company's first-ever earnings call as a public company. In his opening remarks, Defendant Tangney stated that "since this is our first earnings call, I do want to take a minute, step back and provide some broader context on our business and market opportunity." Dr. Tangney then represented that "***today, over 80% of all U.S. physicians use our platform***."

136.    Defendant Tangney overstated by **more than 65%** the number of U.S. physicians who were active members of the platform. Additionally, it was materially misleading for Defendant Tangney to state that "today, 80% of all U.S. physicians use our platform" while omitting that (i) **more than half** of all U.S. physicians either **never** used Doximity or did so on a less-than-quarterly basis; (ii) **over one-third** of doctors who used the Doximity platform did so **less than quarterly**; (iii) **nearly half** of Doximity members who used the platform during the Relevant Period used Doximity's Newsfeed less than quarterly; (iv) approximately **one-fifth** of Doximity members who used the platform during the Relevant Period **never** used the Newsfeed during the Relevant Period; (v) the **majority** of member profiles contained basic errors and omissions, showing a lack of engagement with the profiles; and (vi) Doximity's own internal Dashboard showed that **less** than 80% of U.S. doctors were active members. As a result of these materially

misleading statements and omissions, investors were left with the false and misleading impression that Doximity's user engagement—particularly on its revenue-critical Newsfeed—was significantly higher than it actually was.

137.     On August 10, 2021, coinciding with Doximity's first earnings call as a public company, Doximity posted a video to its Investor webpage, described as a "Business Overview." The video featured Defendant Tangney and purported to describe Doximity's business to potential investors. In the video, Defendant Tangney represented that "*[t]oday, over 80% of all U.S. physicians use our platform*." The video remained posted to Doximity's investor page throughout the Relevant Period.

138.     Defendant Tangney overstated by *more than 65%* the number of U.S. physicians who were active members of the platform. Additionally, it was materially misleading for Defendant Tangney to state that "[t]oday, over 80% of all U.S. physicians use our platform" while omitting that (i) *more than half* of all U.S. physicians either *never* used Doximity or did so on a less-than-quarterly basis; (ii) *over one-third* of doctors who used the Doximity platform did so *less than quarterly*; (iii) *nearly half* of Doximity members that used the platform during the Relevant Period used Doximity's Newsfeed less than quarterly; (iv) approximately *one-fifth* of Doximity members who used the platform during the Relevant Period *never* used the Newsfeed during the Relevant Period; (v) the *majority* of member profiles contained basic errors and omissions, showing a lack of engagement with the profiles; and (vi) Doximity's own internal Dashboard showed that *less* than 80% of U.S. doctors were active members. As a result of these materially misleading statements and omissions, investors were left with the false and misleading impression that Doximity's user engagement—particularly on its revenue-critical Newsfeed—was significantly higher than it actually was.

139.    On August 10, 2021, following Doximity's first earnings call, Defendant Tangney appeared and spoke on behalf of Doximity during an interview by CNBC's TechCheck. The CNBC interviewer asked Defendant Tangney to "tell us about what's driving" the Company's quarterly results. In response, Defendant Tangney again represented that "***we have over 80% of all U.S. physicians as active members on our platform.***"

140.    Defendant Tangney overstated by ***more than 65%*** the number of U.S. physicians who were active members of the platform. Additionally, it was materially misleading for Defendant Tangney to state that "we have over 80% of all U.S. physicians as active members on our platform" while omitting that (i) ***more than half*** of all U.S. physicians either ***never*** used Doximity or did so on a less-than-quarterly basis; (ii) ***over one-third*** of doctors who used the Doximity platform did so ***less than quarterly***; (iii) ***nearly half*** of Doximity members who used the platform during the Relevant Period used Doximity's Newsfeed less than quarterly; (iv) approximately ***one-fifth*** of Doximity members who used the platform during the Relevant Period ***never*** used the Newsfeed during the Relevant Period; (v) the ***majority*** of member profiles contained basic errors and omissions, showing a lack of engagement with the profiles; and (vi) Doximity's own internal Dashboard showed that ***less*** than 80% of U.S. doctors were active members. As a result of these materially misleading statements and omissions, investors were left with the false and misleading impression that Doximity's user engagement—particularly on its revenue-critical Newsfeed—was significantly higher than it actually was.

141.    On November 9, 2021, Defendant Tangney appeared and spoke on behalf of Doximity during the Company's second quarterly earnings call. On the earnings call, Defendant Tangney responded to an analyst report published by J.P. Morgan that questioned the engagement statistics provided by Doximity. In particular, the J.P. Morgan analyst's report suggested that "of

the 1.8M total members on the platform," only "~4.9%, have a session daily with 13.9% on a monthly basis for the month of September"—*i.e.*, far less than the 80% of U.S. doctors than Defendants represented. The J.P. Morgan analyst further questioned in his report whether the "active members" used the Newsfeed, with the analyst suggesting that Doximity members viewed the platform "more like a telehealth solution than a place where members spend time viewing the newsfeed—and thus ads."

142.    During the earnings call, in response to the J.P. Morgan report, Defendant Tangney stated that "***our engagement with our Newsfeed has never been higher***." Additionally, in response to analyst questions about the number of active users on the platform, Defendant Tangney responded:

> ***And I could just hit that head on and say our users and usage is the way I mean, mid-double digit percentages up from our pre-pandemic levels and any third party data that suggests otherwise is just wrong***. And believe me, we've looked at this a bunch of different ways. Internally, we split our three product teams across three different teams that we individually measure called news, network and comms or communications.

143.    Contrary to Defendants' statements that engagement across the platform was "up" and engagement on the Newsfeed had "never been higher," engagement across the platform and on the Newsfeed was ***declining*** throughout the Relevant Period. Additionally, it was materially misleading for Defendant Tangney to tout engagement on Newsfeed as having "never been higher" and to refute all contrary evidence as "just wrong," without disclosing that (i) Defendants overstated by ***more than 65%*** the number of U.S. physicians who were active members of the platform; (ii) ***more than half*** of all U.S. physicians either ***never*** used Doximity or did so on a less-than-quarterly basis; (iii) ***over one-third*** of doctors who used the Doximity platform did so ***less than quarterly***; (iv) ***nearly half*** of Doximity members who used the platform during the Relevant Period used Doximity's Newsfeed less than quarterly; (v) approximately ***one-fifth*** of Doximity

members who used the platform during the Relevant Period *never* used the Newsfeed during the Relevant Period; (vi) the *majority* of member profiles contained basic errors and omissions, showing a lack of engagement with the profiles; and (vii) Doximity's own internal Dashboard showed that *less* than 80% of U.S. doctors were active members. As a result of these materially misleading statements and omissions, investors were left with the false and misleading impression that Doximity's user engagement—particularly on its revenue critical Newsfeed—was significantly higher than it actually was.

144.    On November 10, 2021, after denying analyst concerns about engagement on the Doximity platform during the prior day's quarterly investor call, Defendant Tangney appeared again on CNBC's TechCheck. At the start of the broadcast, Defendant Tangney offered a "quick reminder" about Doximity, during which he stated that "*today over 80% of all U.S. physicians are active members on our platform*."

145.    Defendant Tangney overstated by *more than 65%* the number of U.S. physicians who were active members of the platform. Additionally, it was materially misleading for Defendant Tangney to tell investors that "today over 80% of all U.S. physicians are active members on our platform" while omitting that (i) *more than half* of all U.S. physicians either *never* used Doximity or did so on a less-than-quarterly basis; (ii) *over one-third* of doctors who used the Doximity platform did so *less than quarterly*; (iii) *nearly half* of Doximity members who used the platform during the Relevant Period used Doximity's Newsfeed less than quarterly; (iv) approximately *one-fifth* of Doximity members who used the platform during the Relevant Period *never* used the Newsfeed during the Relevant Period; (v) the *majority* of member profiles contained basic errors and omissions, showing a lack of engagement with the profiles; and (vi) Doximity's own internal Dashboard showed that *less* than 80% of U.S. doctors were active

members. As a result of these materially misleading statements and omissions, investors were left with the false and misleading impression that Doximity's user engagement—particularly on its revenue-critical Newsfeed—was significantly higher than it actually was.

146.    On February 9, 2022, Defendant Tangney made yet another appearance on CNBC's TechCheck. In providing what he termed a "quick reminder" of what Doximity did, Defendant Tangney again represented that "***Today, over 80% of all U.S. physicians use us*** to ***power millions of digital interactions each day***."

147.    Defendant Tangney overstated by ***more than 65%*** the number of U.S. physicians who were active members of the platform. Additionally, it was materially misleading for Defendant Tangney to tell investors that "[t]oday, over 80% of all U.S. physicians" use Doximity to "power millions of digital interactions each day," while omitting that (i) ***more than half*** of all U.S. physicians either ***never*** used Doximity or did so on a less-than-quarterly basis; (ii) ***over one-third*** of doctors who used the Doximity platform did so ***less than quarterly***; (iii) ***nearly half*** of Doximity members who used the platform during the Relevant Period used Doximity's Newsfeed less than quarterly; (iv) approximately ***one-fifth*** of Doximity members who used the platform during the Relevant Period ***never*** used the Newsfeed during the Relevant Period; (v) the ***majority*** of member profiles contained basic errors and omissions, showing a lack of engagement with the profiles; and (vi) Doximity's own internal Dashboard showed that ***less*** than 80% of U.S. doctors were active members. As a result of these materially misleading statements and omissions, investors were left with the false and misleading impression that Doximity's user engagement—particularly on its revenue-critical Newsfeed—was significantly higher than it actually was.

148.    On March 10, 2022, Defendant Tangney appeared and spoke on behalf of Doximity during Morgan Stanley's Technology, Media and Telecom Investor Conference. During

Defendant Tangney's prepared remarks, he represented that "*we have over 80% of all U.S. physicians as active members, and they're doing millions of interactions with us each day*."

149.    Following Defendant Tangney's prepared remarks, an analyst asked Defendant Tangney "where are we at overall on the Doximity journey." In response, Defendant Tangney again stated "*[w]e have over 80% of U.S. physicians today as active members.*"

150.    The above statements were materially false and misleading when made. In making these statements, Defendant Tangney overstated by *more than 65%* the number of U.S. physicians who were active members of the platform. Additionally, it was materially misleading for Defendant Tangney to tell investors that "we have over 80% of all U.S. physicians as active members" who were "doing millions of interactions with us each day" while omitting that (i) *more than half* of all U.S. physicians either *never* used Doximity or did so on a less-than-quarterly basis; (ii) *over one-third* of doctors who used the Doximity platform did so *less than quarterly*; (iii) *nearly half* of Doximity members who used the platform during the Relevant Period used Doximity's Newsfeed less than quarterly; (iv) approximately *one-fifth* of Doximity members who used the platform during the Relevant Period *never* used the Newsfeed during the Relevant Period; (v) the *majority* of member profiles contained basic errors and omissions, showing a lack of engagement with the profiles; and (vi) Doximity's own internal Dashboard showed that *less* than 80% of U.S. doctors were active members. As a result of these materially misleading statements and omissions, investors were left with the false and misleading impression that Doximity's user engagement—particularly on its revenue-critical Newsfeed—was significantly higher than it actually was.

151.    On May 17, 2022, Defendant Tangney appeared and spoke on behalf of Doximity during the Company's quarterly earnings call. During his introductory remarks describing the quarter's results, Defendant Tangney stated that "*[o]ur usage also hit fresh highs.*"

152.    The above statement was materially false and misleading when made. Contrary to Defendants' statements that usage "hit fresh highs," engagement was *declining* across the platform, including on Newsfeed. Additionally, it was materially misleading for Defendant Tangney to tout "record" engagement across the platform and a "record number quarterly active users," without disclosing that (i) Defendants overstated by *more than 65%* the number of U.S. physicians who were active members of the platform; (ii) *more than half* of all U.S. physicians either *never* used Doximity or did so on a less-than-quarterly basis; (iii) *over one-third* of doctors who used the Doximity platform did so *less than quarterly*; (iv) *nearly half* of Doximity members who used the platform during the Relevant Period used Doximity's Newsfeed less than quarterly; (v) approximately *one-fifth* of Doximity members who used the platform during the Relevant Period *never* used the Newsfeed during the Relevant Period; (vi) the *majority* of member profiles contained basic errors and omissions, showing a lack of engagement with the profiles; and (vii) Doximity's own internal Dashboard showed that *less* than 80% of U.S. doctors were active members. As a result of these materially misleading statements and omissions, investors were left with the false and misleading impression that Doximity's user engagement—particularly on its revenue-critical Newsfeed—was significantly higher than it actually was.

153.    On August 4, 2022, Defendant Tangney appeared and spoke on behalf of Doximity during the Company's August 2022 quarterly investor conference call. During the quarterly call, Defendant Tangney represented during his prepared remarks that "our physician engagement *also hit new record highs*."

154.    Following Defendant Tangney's prepared remarks, an analyst questioned him about the state of the business. In response, Defendant Tangney stated "So, hey listen, *our engagement has never been higher as I said*, *hundreds of thousands of doctors every week in our app. Five times what it was four years ago*."

155.    The above statements were materially false and misleading when made. Contrary to Defendants' statements that engagement "hit new record highs" and that "our engagement has never been higher," engagement and deep engagement on the platform were *declining*, including on Newsfeed. Additionally, it was materially misleading for Defendant Tangney to tout "record" engagement across the platform, without disclosing that (i) Defendants overstated by *more than 65%* the number of U.S. physicians who were active members of the platform; (ii) *more than half* of all U.S. physicians either *never* used Doximity or did so on a less-than-quarterly basis; (iii) *over one-third* of doctors who used the Doximity platform did so *less than quarterly*; (iv) *nearly half* of Doximity members who used the platform during the Relevant Period used the Newsfeed less than quarterly; (v) approximately *one-fifth* of Doximity members who used the platform during the Relevant Period *never* used Doximity's Newsfeed during the Relevant Period; (vi) the *majority* of member profiles contained basic errors and omissions, showing a lack of engagement with the profiles; and (vii) Doximity's own internal Dashboard showed that *less* than 80% of U.S. doctors were active members. As a result of these materially misleading statements and omissions, investors were left with the false and misleading impression that Doximity's user engagement—particularly on its revenue-critical Newsfeed—was significantly higher than it actually was.

156.    On November 10, 2022, Defendant Tangney appeared and spoke on behalf of Doximity during the Company's November 2022 quarterly investor conference call. During the

quarterly call, Defendant Tangney stated that engagement on the Doximity platform achieved "***fresh highs in Q2.***"

157.    The above statement was materially false and misleading when made. Contrary to Defendants' statements that engagement achieved "fresh highs in Q2," engagement and deep engagement were ***declining***, including on Newsfeed. Additionally, it was materially misleading for Defendant Tangney to tout "fresh highs" in engagement on the Doximity platform, without disclosing that (i) Defendants overstated by ***more than 65%*** the number of U.S. physicians who were active members of the platform; (ii) ***more than half*** of all U.S. physicians either ***never*** used Doximity or did so on a less-than-quarterly basis; (iii) ***over one-third*** of doctors who used the Doximity platform did so ***less than quarterly***; (iv) ***nearly half*** of Doximity members who used the platform during the Relevant Period used the Newsfeed less than quarterly; (v) approximately ***one-fifth*** of Doximity members who used the platform during the Relevant Period ***never*** used Doximity's Newsfeed during the Relevant Period; (vi) the ***majority*** of member profiles contained basic errors and omissions, showing a lack of engagement with the profiles; and (vii) Doximity's own internal Dashboard showed that ***less*** than 80% of U.S. doctors were active members. As a result of these materially misleading statements and omissions, investors were left with the false and misleading impression that Doximity's user engagement—particularly on its revenue-critical Newsfeed—was significantly higher than it actually was.

158.    On February 9, 2023, Defendant Tangney appeared and spoke on behalf of Doximity during the Company's February 2023 quarterly investor conference call. In his introductory remarks, while discussing Doximity's "network growth," Defendant Tangney stated that "***our quarterly active users among physicians … hit an all-time high*** last quarter ***across our entire platform***" and later repeated that the Company had "***all time high network usage in Q3***."

159.    The above statements were materially false and misleading when made. Contrary to Defendants' statements that engagement on the Doximity platform "hit an all-time high" across the "entire platform," engagement and deep engagement were *declining*, including on the Newsfeed. Additionally, it was materially misleading for Defendant Tangney to tout an "all-time high" in engagement on the Doximity platform, without disclosing that: (i) Defendants overstated by *more than 65%* the number of U.S. physicians who were active members of the platform; (ii) *more than half* of all U.S. physicians either *never* used Doximity or did so on a less-than-quarterly basis; (iii) *over one-third* of doctors who used the Doximity platform did so *less than quarterly*; (iv) *nearly half* of Doximity members who used the platform during the Relevant Period used the Newsfeed less than quarterly; (v) approximately *one-fifth* of Doximity members who used the platform during the Relevant Period *never* used Doximity's Newsfeed during the Relevant Period; (vi) the *majority* of member profiles contained basic errors and omissions, showing a lack of engagement with the profiles; (vii) Doximity's own internal Dashboard showed that *less* than 80% of U.S. doctors were active members, with engagement on the platform decreasing; and (viii) Doximity refused to provide and deliberately hid from customers its engagement metrics, including on the Newsfeed, precisely because they were lower than its customers understood. As a result of these materially misleading statements and omissions, investors were left with the false and misleading impression that Doximity's user engagement—particularly on its revenue-critical Newsfeed—was significantly higher than it actually was.

160.    On May 16, 2023, Defendant Tangney appeared and spoke on behalf of Doximity during the Doximity's earnings May 2023 quarterly investor call. In his opening remarks, Defendant Tangney again stated that "*[o]ur usage hit fresh high[s] in Q4. Across our entire platform, we achieved a record number of quarterly active users*."

161.    The above statement was materially false and misleading when made. Contrary to Defendants' statements that engagement on the Doximity platform "hit fresh highs" across the "entire platform," engagement and deep engagement were *declining*, including on the Newsfeed. Additionally, it was materially misleading for Defendant Tangney to tout an "all-time high" in engagement on the Doximity platform, without disclosing that: (i) Defendants overstated by *more than 65%* the number of U.S. physicians who were active members of the platform; (ii) *more than half* of all U.S. physicians either *never* used Doximity or did so on a less-than-quarterly basis; (iii) *over one-third* of doctors who used the Doximity platform did so *less than quarterly*; (iv) *nearly half* of Doximity members who used the platform during the Relevant Period used the Newsfeed less than quarterly; (v) approximately *one-fifth* of Doximity members who used the platform during the Relevant Period *never* used Doximity's Newsfeed during the Relevant Period; (vi) the *majority* of member profiles contained basic errors and omissions, showing a lack of engagement with the profiles; (vii) Doximity's own internal Dashboard showed that *less* than 80% of U.S. doctors were active members, with engagement on the platform decreasing; and (viii) Doximity refused to provide and deliberately hid from customers its engagement metrics, including on the Newsfeed, precisely because they were lower than its customers understood. As a result of these materially misleading statements and omissions, investors were left with the false and misleading impression that Doximity's user engagement—particularly on its revenue-critical Newsfeed—was significantly higher than it actually was.

162.    On June 6, 2023, Doximity held its inaugural Investor Day in which Defendant Tangney, among other Doximity executives and selected panelists, pitched the Company to investors. In his introductory remarks Defendant Tangney set the stage by claiming once again that "*over 80% of all physicians . . . use our platform*."

163.    The above statement was materially false and misleading when made. In making this statement, Defendant Tangney overstated by *more than 65%* the number of U.S. physicians who were active members of the platform. Additionally, it was materially misleading for Defendant Tangney to tell investors that "over 80% of all physicians . . . use our platform" while omitting that (i) *more than half* of all U.S. physicians either *never* used Doximity or did so on a less-than-quarterly basis; (ii) *over one-third* of doctors who used the Doximity platform did so *less than quarterly*; (iii) *nearly half* of Doximity members who used the platform during the Relevant Period used Doximity's Newsfeed less than quarterly; (iv) approximately *one-fifth* of Doximity members who used the platform during the Relevant Period *never* used the Newsfeed during the Relevant Period; (v) the *majority* of member profiles contained basic errors and omissions, showing a lack of engagement with the profiles; (vi) Doximity's own internal Dashboard showed that *less* than 80% of U.S. doctors were active members; and (vii) Doximity refused to provide and deliberately hid from customers its engagement metrics, including on the Newsfeed, precisely because they were lower than its customers understood. As a result of these materially misleading statements and omissions, investors were left with the false and misleading impression that Doximity's user engagement—particularly on its revenue-critical Newsfeed—was significantly higher than it actually was.

164.    On June 14, 2023, the Company filed its annual proxy statement with the SEC (the "2023 Proxy"), which was solicited by Defendants Tangney, Benjamin, Cabral, Spain, Wampler, and Yang.

165.    The 2023 Proxy solicited shareholders to approve, among others: (i) re-elect Defendants Spain and Cabral to the Board; (ii) ratify the appointment of Deloitte & Touche LLP as the Company's independent registered accounting firm for the 2024 Fiscal Year; and (iii)

approve, via non-binding, advisory vote, the frequency of future advisory votes on executive compensation.

166.    In addition, the 2023 Proxy represented that the Company had adequate risk oversight functions that were being exercised by the Board. Specifically, the 2023 Proxy states:

> Our board has responsibility for the oversight of our risk management processes and, either as a whole or through its committees, regularly discusses with management our major risk exposures, their potential impact on our business and the steps we take to manage them. The risk oversight process includes receiving regular reports from board committees and members of senior management to enable our board to understand our risk identification, risk management, and risk mitigation strategies with respect to areas of potential material risk, including operations, finance, legal, regulatory, cybersecurity, strategic, and reputational risk.

167.    However, in reality, these assertions were false and/or misleading, as Defendants were causing the Company to issue the false and misleading statements described herein.

168.    Specifically, the 2023 Proxy failed to disclose to investors: (i) the Company had overstated the number of U.S. doctors who were active members of its platform by **_more than 65%_**; (ii) the Company had concealed that **_less than half_** of U.S. doctors on the platform actually used the all-important Newsfeed on a quarterly basis; and (iii) the Company falsely represented that engagement was increasing when, in truth, it was **_decreasing_** across the platform, including on Newsfeed; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

## X.    DEFENDANTS ILLICIT INSIDER SALES

169.    During the Relevant Period, as Defendants promoted the Company's stock through false and misleading statements, Defendants Bryson, Benjamin, Cabral, and Wampler (the "Insider Selling Defendants") capitalized on the artificially inflated stock price by selling portions of their holdings of Doximity common stock.

170.    Specifically, during the Relevant Period, the Insider Selling Defendants collectively sold over 100,000 shares of Doximity stock for proceeds of approximately $4.4 million. The sales made by the Insider Selling Defendants during the Relevant Period were suspicious in timing and amount, and were inconsistent with their pre- and post-Relevant Period trading practices.

171.    Defendant Bryson sold 25,000 shares of Company stock during the Relevant Period, for total proceeds of approximately $1 million:

| Date | Number of Shares | Average Price/Share | Proceeds |
|---|---|---|---|
| 2/2/2023 | 25,000 | $40.00 | $1,000,000 |

172.    Defendant Benjamin sold 10,000 shares of Company stock during the Relevant Period, for total proceeds of approximately $586,820:

| Date | Number of Shares | Average Price/Share | Proceeds |
|---|---|---|---|
| 2/11/2022 | 10,000 | $58.68 | $586,820 |

173.    Defendant Cabral sold 57,214 shares of Company stock during the Relevant period, for total proceeds of approximately $1,935,757:

(Chart appears on next page)

| Date | Number of Shares | Average Price/Share | Proceeds |
|---|---|---|---|
| 2/14/2023 | 10,000 | $32.55 | $425,460 |
| 2/15/2023 | 7,500 | $35.00 | $262,500 |
| 4/3/2023 | 10,000 | $32.00 | $319,960 |
| 4/11/2023 | 7,500 | $35.00 | $262,500 |
| 7/3/2023 | 10,000 | $33.80 | $338,050 |
| 7/12/2023 | 7,500 | $35.00 | $262,500 |
| 7/28/2024 | 4,714 | $34.96 | $164,787 |

174.    Defendant Wampler sold 23,800 shares of Company stock during the Relevant Period, for total proceeds of over $900,000:

| Date | Number of Shares | Average Price/Share | Proceeds |
|---|---|---|---|
| 2/11/2022 | 2,200 | $58.69 | $129,107 |
| 3/1/2022 | 2,200 | $60.73 | $133,614 |
| 4/1/2022 | 2,200 | $53.34 | $116,830 |
| 5/2/2022 | 2,200 | $40.09 | $87,730 |
| 12/14/2023 | 2,500 | $26.00 | $65,000 |
| 12/15/2023 | 2,500 | $26.65 | $66,630 |
| 1/2/2024 | 5,000 | $28.26 | $141,330 |
| 2/1/2024 | 2,500 | $27.05 | $67,625 |
| 3/1/2024 | 2,500 | $27.88 | $69,700 |
| 4/1/2024 | 2,500 | $26.97 | $67,425 |

## XI.    THE INDIVIDUAL DEFENDANTS CAUSE THE COMPANY TO REPURCHASE SHARES OF ITS COMMON STOCK AT ARTIFICIALLY INFLATED PRICES

175.    During the Relevant Period the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of ***over $109.1 million*** to repurchase approximately 3,398,998 shares of its own common stock at artificially inflated prices from June 2022 through July 2023.

176.    The Company's Quarterly Report on Form 10-Q filed with the SEC on August 5, 2022, for the period ended June 30, 2022, discloses that, between June 1, 2022 and June 30, 2022, the Company purchased 273,746 Class A shares for approximately $8,869,370 million at an average price of $32.40 per share.

177.    The Company's Quarterly Report on Form 10-Q filed with the SEC on November 10, 2022, for the period ended September 30, 2022, discloses that, between August 1, 2022 and August 31, 2022, the Company purchased 1,160,157 Class A shares for approximately $37,971,938 at an average price of $32.73 per share, and that, between September 1, 2022 and September 30, 2022, the Company purchased 717,079 Class A shares for approximately $23,161,651 at an average price of $32.30 per share.

178.    The Company's Annual Report on Form 10-K filed with the SEC on May 26, 2023, discloses that, between March 1, 2023 and March 31, 2023, the Company purchased 523,647 Class A shares for approximately $16,018,361 at an average price of $30.59 per share.

179.    The Company's Quarterly Report on Form 10-Q filed with the SEC on August 8, 2023, for the period ended June 30, 2023, discloses that, between April 1, 2023 and April 30, 2023, the Company purchased 123,086 Class A shares for approximately $3,925,212 at an average price of $31.89 per share; that between May 1, 2023 and May 31, 2023, the Company purchased 259,753

Class A shares for approximately $8,201,374 at an average price of $31.62 per share; and that, between June 1, 2023 and June 30, 2023, the Company purchased 281,115 Class A shares for approximately $8,967,568 at an average price of $31.90 per share.

180.    The Company's Quarterly Report filed with the SEC on November 9, 2023, for the period ended September 30, 2023, discloses that, between July 1, 2023 and July 31, 2023, the Company purchased 60,795 Class A shares for approximately $1,985,564 at an average price of $32.66 per share.

## XII.    DAMAGES TO THE COMPANY

181.    Doximity has been, and will continue to be, severely damaged and injured by the Defendants' misconduct.  As a direct and proximate result of the Defendants' conduct, Doximity has been seriously harmed and will continue to be.  Such harm includes, but is not limited to:

    a.  costs incurred in compensation and benefits paid to Defendants that violated federal securities laws;

    b.  substantial loss of market capital;

    c.  costs already incurred and to be incurred defending the pending securities fraud class action lawsuit captioned *In re Doximity, Inc. Securities Litigation*, Case No. 5:24-cv-02281-EKL (C.D. Cal.); and

    d.  any fines or other liability resulting from the Company's violations of federal law.

182.    In addition, Doximity's business, goodwill and reputation with its business partners, regulators and shareholders have been gravely impaired.  The credibility and motives of management are now in serious doubt.

183.    The wrongdoing complained of herein has irreparably damaged Doximity's corporate image and goodwill.  For at least the foreseeable future, Doximity will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Doximity's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## XIII.   DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

184.    Plaintiff brings this action derivatively in the right and for the benefit of Doximity to redress injuries suffered, and to be suffered, by Doximity as a direct result of violations of federal securities laws by the Defendants.  Doximity is named as a Nominal Defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

185.    The Board of Doximity, at the time this action was commenced, consisted of Defendants Tangney, Spain, Yang, Wampler, Benjamin, and Cabral, a total of six individuals.

186.    Plaintiff has not made any demand on the Board to institute this action because a pre-suit demand on the Doximity Board would be futile, and therefore, excused.  This is because a majority of the Board faces a substantial likelihood of liability as a result of their scheme and false and misleading statements and/or omissions of material adverse facts which render them unable to impartially consider a demand to pursue the wrongdoing alleged herein.

187.    Each of the Director Defendants were responsible for reviewing and approving the Company's public statements made in press releases and financial filings with the SEC throughout the Relevant Period. By authorizing the false and misleading statements and material omissions and described above during the Relevant Period concerning the Company's business and prospects,

each of the Director Defendants knowingly faces a substantial likelihood of liability for their participation in the illicit acts alleged herein.

188.    Upon information and belief, in their capacity as members of the Company's Board, the Director Defendants were privy to specific information related to the Company's business and financial prospects, which would reasonably put them on notice that the statements they were making were in fact false and misleading.

**Demand is Futile as to Defendant Tangney Because His**
**Principal Professional Occupation as the Company's CEO and Co-Founder**

189.    Defendant Tangney joined the Company as founder in 2010 and has been the Company's CEO since inception in 2010. Defendant Tangney is also the Chairman of the Board. The Company's 2023 Proxy suggests that the board has "responsibility for the oversight of our risk management process". As such, in defendant's position as Chairman of the Board, it is reasonable to infer that due to the importance of the Company's user engagement numbers to its bottom line, Defendant Tangney would have been aware of the growing "trend" of decline in the Company's active users as well as engagement statistics with the Newsfeed. In his role as CEO of the Company for the fiscal years 2021, 2022 and 2023, Defendant Tangney received $21,312,948, $243,388 and $243,726 in total compensation, respectively.  The Company does not claim that Defendant Tangney is an independent director and because his primary source of income and primary employment is his employment as Founder and CEO of Doximity and his professional reputation is inextricably bound to his role at Doximity Defendant Tangney is incapable of acting independently and demand is futile upon him.

190.    Furthermore, Defendant Tangney controls 67% of the voting power of the Company as of April 1, 2024. Defendant Tangney's significant ownership of Company stock enables him to control Doximity's management and affairs, and most matters requiring stockholder approval,

including, but not limited to, the election of directors, financing activities, a merger or sale of the Company's assets and other significant corporate transactions. As such none of the other members of the Doximity Board would take action against Defendant Tangney since it would jeopardize their continued lucrative positions at the Company.

191.    Lastly, Defendant Tangney is named as a defendant in the pending Related Securities Action. Accordingly, he is incapable of considering a demand to commence and vigorously prosecute the claims asserted in this Action with the required independence and disinterest.

### Demand is Futile as to the Audit Committee Defendants

192.    Demand is futile as to Defendants Spain, Benjamin and Cabral (the "Audit Committee Defendants") as members of the Audit Committee for their knowing failure to fulfill her responsibilities.

193.    The Board of Directors adopted an Audit Committee Charter, setting forth the responsibilities of the Audit Committee.  The duties of the Audit Committee are set forth herein, *supra*.

194.    Upon information and belief, in their capacity as members of the Audit Committee, the Audit Committee Defendants were privy to specific information related to the Company's business, operations, and prospects, which would reasonably put them on notice that the statements set forth above in the Company's public filings were materially false and misleading when made.

195.    The Company's public filings concerning the Company's business and prospects during the Relevant Period contained materially misleading information and/or omitted material information concerning the percentage of U.S. physicians actively utilizing their platform (claiming 80% when the number was far lower).  In their capacity as members of the Audit

Committee, the Audit Committee Defendants were charged with ensuring that these reports did not contain such materially misleading information. By allowing documents to be filled with misleading information, the Audit Committee Defendants face a sufficiently significant likelihood of liability so as to render them interested. Accordingly, the Audit Committee Defendants cannot adequately independently consider a demand.

**Demand is Futile as to the Insider Selling Defendants**

196.    Making a demand on the Insider Selling Defendants (Defendants Benjamin, Bryson, Cabral, and Wampler) would be a futile and useless act as those defendants directly benefited from the wrongs and acts complained of herein and face a sufficiently substantial likelihood of liability in connection with their insider illicit stock sales detailed above, and cannot possibly consider a demand to sue themselves based on those transactions in which they reaped significant benefits.

197.    The Insider Selling Defendants made such illicit trades during the Relevant Period by wrongfully benefiting from the Company's artificially inflated stock price at the expense of the Company's shareholders. Throughout the Relevant Period, Defendants misled the investing public regarding the true business prospects of the Company. When the truth finally emerged, the Company's stock plummeted, but only after the Insider Selling Defendants had substantially benefited by selling significant portions of their stock at the higher prices.

198.    Specifically, during the Relevant Period the above-named Insider Selling Defendants sold significant portions of their Doximity Stock, reaping millions of dollars in proceeds.

199.    The Company has adopted an Insider Trading Compliance Policy (the "Insider Policy) to provide guidance with respect to the trading of the Company's securities. The Insider

Policy provides that all persons covered under the policy cannot trade while in possession of inside information, including officers and directors of the Company.

200.    As a result, the Insider Selling Defendants have violated the Company's Insider Trading Compliance Policy and face a sufficiently substantial likelihood of liability due to their illicit trades, rendering them interested in considering demand.

## Demand is Futile as to the Director Defendants

201.    Plaintiff has not made any demand on the Board to institute this action because a pre-suit demand on the Company's Board would be futile, and therefore, excused.  This is because a majority of the Board faces a substantial likelihood of liability as a result of their knowing toleration of the above described false and misleading statements and omissions of material adverse facts, which render them unable to impartially consider a demand to pursue the wrongdoing alleged herein.

202.    Upon information and belief, in their capacity as members of the Company's Board, the Director Defendants were privy to specific information related to the Company's business and financial prospects, which would reasonably put them on notice that the statements they were making were in fact false and misleading.

203.    Each of the Director Defendants were responsible for reviewing and approving the Company's public statements made in press releases and financial filings with the SEC throughout the Relevant Period.  By authorizing the false and misleading statements and material omissions and described above during the Relevant Period concerning the Company's business and prospects, each of the Director Defendants knowingly faces a substantial likelihood of liability for their participation in the illicit acts alleged herein.

204.    Each of the Director Defendants is also beholden to Defendant Tangney as a result of his 67% control of voting power of the Company. As such, the Director Defendants will not act against Defendant Tangney given his position as a controlling shareholder which enables him to control Doximity's management and affairs, and most matters requiring stockholder approval, including the election of directors, financing activities, a merger or sale of the Company's assets and other significant corporate transactions.

205.    Lastly, each of the Director Defendants authorized the filing and release of the 2023 Proxy Statement, which contained materially false and misleading statements and/or material omissions.

206.    Accordingly, the Director Defendants face a sufficiently substantial likelihood of liability such as to create a reasonable doubt as to their impartially consider a demand to sue themselves in the present action.

## COUNT I

### Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act

207.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

208.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

209.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

210.    Under the direction and watch of the Individual Defendants, the 2023 Proxy Statement failed to disclose to investors that: (i) the actual number of U.S. physicians that were members of the Doximity platform was far less than the 80% that was claimed; (ii) Doximity was internally aware of this discrepancy by utilizing its own internal monitoring resources; (iii) as a result of the foregoing, the financial strength of ads run on the Doximity platform were significantly less financially appealing than claimed; (iv) accordingly, Doximity's commercial and financial prospects were overstated; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times. Furthermore, the 2023 Proxy Statement falsely represented that the board was conducting appropriate risk oversight.

211.    The 2023 Proxy Statement was also materially misleading because the facts show that the Board and its committees utterly failed to implement controls to effectively oversee conduct risk relating to the Company's core business, operations and prospects in relation to the conduct alleged herein.

212.    The Individual Defendants knew or recklessly disregarded that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to shareholders in voting on the matters set forth for shareholder determination in the

2022 and 2023 Proxy Statements, including but not limited to, the re-election of the Company's directors.

213.   The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2023 Proxy Statement.

214.   Plaintiff on behalf of Doximity has no adequate remedy at law.

### COUNT II

**Against Defendant Tangney for
Contribution Under Section 10(b) of the Exchange Act,
<u>Rule 10b-5 Promulgated Thereunder, and/or Section 20(a) of the Exchange Act</u>**

215.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

216.    As a result of the conduct and events alleged above, Doximity has been named as a defendant in the Related Securities Action brought on behalf of Doximity shareholders in which it is a joint tortfeasor in claims brought under Section 10(b) of the Securities and Exchange Act and Rule 10(b)-5 promulgated thereunder.

217.   Federal law provides Doximity with a cause of action against other alleged joint tortfeasors under Rule 10b-5. In particular, under the Supreme Court's decision in *Musick, Peeler & Garrett v. Employers Insurance of Wausau*, 508 U. S. 286, Doximity has a federal law right of contribution against joint tortfeasors under Rule 10b-5. Section 21D(f) of the Securities and Exchange Act further sets forth specific provisions entitling Doximity to contribution against all joint tortfeasors under Rule 10b-5, regardless of whether they have been named as defendants in the currently pending Related Securities Action and sets forth specific rules regarding the determination of claims for such contribution.

218.    Accordingly, Plaintiff, on behalf of Doximity, hereby claims contribution against Defendant Tangney, who has been named in the currently pending Related Securities Action as a joint tortfeasor with Doximity under Rule 10b-5, or if joined in such actions, would be liable for the same damages as Doximity.

219.    Doximity claims no right to indemnification under the federal securities laws from him in this count, but rather only claims contribution.

### Allegations Regarding Defendant Tangney

220.    Throughout the Relevant Period, Defendant Tangney caused the Company to issue false and misleading statements and/or omit material information in public statements and/or Company filings concerning the Company's business and financial prospects. These statements were materially misleading to persons who purchased Doximity securities during the Relevant Period.

221.    The plaintiffs in the Related Securities Action allege that they relied, directly or indirectly, upon these false statements and misleadingly omissive disclosures in purchasing Doximity securities, and, as a result, suffered damages because value of their investments was distorted by the false and materially omissive statements, and they purchased such securities at such distorted prices.

222.    The damages suffered by said investors were caused by reason of the fact that (i) they were induced to purchase said securities by the false and misleading statements alleged herein, and (ii) the reveal of the true nature of the Company's business and prospects resulted in the decrease in price of its securities, causing the value of shareholders investments to drop.

223.    The plaintiffs in the Related Securities Action were unaware of the false and misleading nature of said statements and omissive disclosures.

224.    When Defendant Tangney signed off on or made the false statements and omissive disclosures detailed herein, he had actual knowledge that they were false and misleading. As alleged in detail herein, due to his positions as an employee and director of Doximity, t Defendant Tangney was privy to information regarding the Company's business and financial prospects and would have been aware that the statements made were in fact false and misleading when made.

225.    Accordingly, Defendant Tangney is liable for damages under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and, if Doximity were to be held liable in the Related Securities Action, Defendant Tangney would be liable to it for contribution. Plaintiffs hereby derivatively claim such right of contribution on behalf of Doximity.

**Allegations Regarding Defendant Tangney as a Control Person**

226.    In acting as alleged above, Defendant Tangney was acting as an authorized agent of Doximity in his roles as a director and CEO. Because of his position of control and authority, Defendant Tangney was able to, and did, control the contents of the various reports, press releases and public filings disseminated by the Company throughout the Relevant Period, as alleged herein.

227.    Defendant Tangney was a "controlling person" of Doximity within the meaning of Section 20(a) of the Exchange Act, and, accordingly, Defendant Tangney could be held liable to the plaintiffs in the Related Securities Action. Were the Company to be held liable in said Related Securities Action, Defendant Tangney would be liable to it for contribution.

228.    Plaintiff hereby derivatively claims such right of contribution on behalf of Doximity.

**COUNT III**

**Against the Individual Defendants for Breaches of Fiduciary Duty**

229.    Plaintiff incorporates by reference and realleges each and every allegation

contained above, as though fully set forth herein.

230.    The Individual Defendants owed and owe Doximity fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Doximity the highest obligation of good faith, loyalty, and due care.

231.    The Individual Defendants have violated and breached their fiduciary duties of good faith, loyalty, and due care by causing or allowing the Company to disseminate to Doximity shareholders materially misleading and inaccurate information through the Company's SEC filings throughout the Relevant Period.  These actions could not have been a good faith exercise of prudent business judgment.

232.    During the course of the discharge of their duties, the Individual Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet the Individual Defendants caused Doximity to engage in the conduct complained of herein which they knew had an unreasonable risk of damage to the Company, thus breaching their duties owed to Doximity and its shareholders.  As a result, the Individual Defendants grossly mismanaged the Company.

233.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

234.    Plaintiff, on behalf of Doximity, has no adequate remedy at law.

**COUNT IV**

**Against the Insider Selling Defendants for Breach
of Fiduciary Duty for Insider Selling and Misappropriation of Information**

235.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

236.    The Insider Selling Defendants (defined *supra*), throughout the Relevant Period, engaged in the sale of Company stock at artificially inflated prices while in possession of material information that had yet to be released to the investing public.  The Insider Selling Defendants engaged in this course of conduct to keep the public unaware of the adverse information affecting the Company's stock price and benefited to the detriment of the investing public and the Company itself.

237.    This proprietary, non-public information concerning the Company's business and prospects was known by the Insider Selling Defendants, who sold substantial amounts of their shares of Doximity stock during the period Defendants' fraud was ongoing.  These sales were made for Defendants own self-interests, at the expense of Doximity and the investing public.

238.    By selling the Company's common stock while in possession of this information and failing to fully inform the investing public, the Insider Selling Defendants breached their fiduciary duties of good faith and loyalty to the Company.

239.    As such, the Insider Selling Defendants are legally responsible to the Company for the significant profits they received from the sales of their stock in Doximity.

## COUNT V

### Against all the Individual Defendants for Unjust Enrichment

240.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

241.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Doximity.

242.    The Individual Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to Doximity.

243.    Plaintiff, as a shareholder and representative of Doximity, seeks restitution from the Individual Defendants and seek an order from this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants from their wrongful conduct and breaches of fiduciary duty.

244.    Plaintiff, on behalf of Doximity, has no adequate remedy at law.

## COUNT VI

### Against the Individual Defendants for Abuse of Control

245.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

246.    The Individual Defendants have taken advantage of their positions as officers and/or directors of the Company to the detriment of Doximity and the investing public by causing the Company to issue materially misleading statements and/or omitting material information concerning the reporting of the Company's financials and lack of related internal control.

247.    As such, the Individual Defendants have abused their positions of control with the Company and are legally responsible.

248.    Thus, for the aforementioned reasons, the Individual Defendants are liable to the Company for their wrongdoing.

## COUNT VII

### Against the Individual Defendants for Waste of Corporate Assets

249.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

250. The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue. It resulted in continuous, connected, and ongoing harm to the Company.

251. As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, among other things: (a) paying excessive compensation and bonuses to certain executive officers; (b) awarding self-interested stock options to certain officers and directors; (c) caused the Company to repurchase its own stock at artificially inflated prices, costing the Company over $109.1 million; and (d) incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and its officers against the Related Securities Action.

252. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

253. Plaintiff, on behalf of the Company, has no adequate remedy at law.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment in the Company's favor against all Defendants as follows:

A. Declaring that Plaintiff may maintain this action on behalf of Doximity and that Plaintiff is an adequate representative of the Company;

B. Determining and awarding to Doximity the damages sustained by it as a result of the violations set forth above from each of the Defendants, jointly and severally, together with interest thereon;

C. Directing Doximity and the Director Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Doximity and its shareholders from a repeat of the

damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's By-Laws or Articles of Incorporation; and the following actions as may be necessary to ensure proper Corporate Governance Policies:

    (1) a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board; and

    (2) a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

    D.    Determining and awarding to Doximity exemplary damages in an amount necessary to punish Defendants and to make an example of Defendants to the community according to proof at trial;

    E.    Awarding Doximity restitution from Defendants, and each of them;

    F.    Awarding Doximity Contribution from Defendant Tangney;

    G.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

    H.    Granting such other and further equitable relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: December 18, 2024                                    Respectfully submitted,

                                                           */s/ Ryan M. Ernst*
                                                           **BIELLI & KLAUDER, LLC**
                                                           Ryan M. Ernst, Esq. (No. 4788)
                                                           1204 N. King Street
                                                           Wilmington, DE 19801
                                                           Main: (302) 803-4600
                                                           Direct: (302) 321-5411
                                                           rernst@bk-legal.com

                                                           *Attorneys for Plaintiffs*

**LIFSHITZ LAW PLLC**
Joshua M. Lifshitz
1190 Broadway
Hewlett, NY 11557
Telephone: (516) 493-9780
Facsimile: (516) 280-7376
jlifshitz@lifshitzlaw.com